Joseph D. BOWLER, Appellant,

v.

UNITED STATES, Appellee.

No. 82–1701.

District of Columbia Court of Appeals.

Argued March 6, 1984.
Decided July 16, 1984.

Gregory C. Glynn, Washington, D.C., appointed by this court, for appellant.

John M. Facciola, Asst. U.S. Atty., Washington, D.C., with whom Stanley H. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell, Thomas J. Tourish, Jr., and Robert F. O'Neill, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, MACK, Associate Judge, and GALLAGHER, Associate Judge, Retired.

MACK, Associate Judge:

▆▆▆ On November 9, 1982, appellant Joseph D. Bowler, was found guilty after a jury trial of murder in the second degree in violation of D.C. Code §§ 22–2403, –3202 (1981) and acquitted of two counts of assault in violation of D.C. Code § 22–504 (1981).[1] Appellant was sentenced on De-

---

1. The assault charges arose in connection with an incident in appellant's house on December 24, 1981, in which he allegedly attacked Pamela Joyner and the decedent Jackson with a stick and machete. Appellant defended against these charges on a theory of self-defense and the trial court instructed the jury on self-defense with respect to the assault counts.

cember 20, 1982 to a term of imprisonment from fifteen to forty-five years. Appellant contends that several instances of prosecutorial misconduct prejudiced and coerced the jury into finding the malice necessary to support a verdict of second-degree murder. Specifically, he argues that the prosecutor (1) commented on his failure to testify, (2) obtained testimony from his common law spouse in contravention of the statutory marital privilege, and (3) made improper closing and rebuttal arguments.[2] We agree. The cumulative impact of the prosecutor's conduct was sufficiently prejudicial as to have denied appellant a fair trial. Accordingly, we reverse. But, given the particular nature of the misconduct on these facts and the overwhelming strength of the government's evidence as to certain aspects of the case, we hold that the misconduct contaminated only the jury's deliberations on the finding of malice requisite for the verdict of murder in the second degree. The jury was charged on the lesser-included offense of manslaughter. Hence, our disposition is to remand the case with instructions either to permit the government to elect to retry appellant on the charge of second-degree murder or to enter a judgment on the charge of manslaughter with appropriate resentencing to follow.

■ On February 21, 1982, Claude Jackson died from a single gunshot wound to the neck. Jackson was shot in the hallway on the first floor of the house at 1133 Park Street, Northeast. He lived on the first floor with his fiance Pamela Joyner. Appellant lived in the same house but on the second floor. He and Pamela were cousins (their mothers were sisters) and she had moved into the house to help care for appellant's ill mother before she died on January 21, 1982. Evidence established that appellant and Jackson were alone in the house at the time of the shooting and that appellant had been drinking. Though mortally wounded, Jackson went across the street to 1134 Park Street, Northeast, where he collapsed at the door of Pamela's mother, Betty Joyner. Betty Joyner testified that Jackson told her appellant shot him.[3] She further testified that she went to appellant's house to find out whether Pamela was safe and that at the house appellant told her Jackson was talking about his mother and stated, "I didn't shoot him out there. I stabbed him." Joyner stated that appellant's words were slurry and that he was staggering. The police were summoned and placed appellant under arrest. Upon arriving at the police station, appellant inquired of an officer where he was and why he was locked up. The officer replied that he had shot a man on Park Street, at which point appellant blurted out: "Well, you'd have shot him too if he tried to touch you, wouldn't you."[4] After being

---

One of appellant's arguments before this court challenges the trial court's denial of defense counsel's motion to sever the assault counts from the homicide charge. Clearly, appellant's prior assault upon the decedent would have been admissible in the second-degree murder prosecution. *Drew v. United States,* 118 U.S. App.D.C. 11, 16, 331 F.2d 85, 90 (1964); *see Rink v. United States,* 388 A.2d 52, 55–56 (D.C.1978). The inclusion of the assault count against Joyner may have resulted in some confusion and prejudice to appellant's case, but given the interest in judicial efficiency, we cannot say that the trial court abused its discretion in refusing to sever this count. *Robinson v. United States,* 452 A.2d 354, 358 (D.C.1982); *Warren v. United States,* 436 A.2d 821, 831–32 (D.C.1981); *Winestock v. United States,* 429 A.2d 519, 524 (D.C. 1981).

**2.** Additional allegations of error were raised on appeal. Because we find them to be lacking in merit, we give them but cursory treatment. *See supra* note 1, *infra* notes 4, 8, 12.

**3.** This statement that "Joseph had shot him" was admitted into evidence as an excited utterance.

**4.** Appellant's counsel objected to the admission into evidence of this particular statement but the trial court overruled his objection without inquiring into the issue of voluntariness. Defense counsel had not moved prior to trial to suppress the statement. We reject appellant's argument on appeal that the trial court erred in summarily admitting these remarks. Even if the court should have conducted an inquiry as to their admissibility, we believe it plain that the officer's words in response to appellant's question did not constitute interrogation under

read his *Miranda* rights, appellant gave a statement to one of the police officers which the officer wrote down and related to the jury. According to the officer, appellant told him, " 'the guy [Jackson] said something about my mother who just died; the other guy had the gun' and then I asked him where the gun is now and he said, 'I don't know man.' " Jackson died shortly after the shooting.

No gun was recovered by the police during their search of the premises,[5] and no bullet was found in the hallway.[6] But, during a conversation appellant had with his stepfather, Lawrence Shin, who visited him in jail, appellant asked him to go to the house to retrieve a gun from behind a chest of drawers in his room. That gun, recovered by Betty Joyner's son, was subsequently turned over to the police. It was a .22 caliber revolver with one expended and one misfired round. Because no bullet was found and the autopsy did not reveal the size of the bullet which passed through decedent's neck, only circumstantial evidence tied this gun to the shooting. Also, given the particular type of gun, no practical test could be performed to determine if

appellant's fingerprints were on it. The autopsy did reveal that there were no bruises on decedent's body. In addition, the absence of gunpowder marks on either decedent's body or clothing indicated he was shot from a distance of at least two feet. Finally, evidence derived from a review of the scene of the crime indicated that there were no signs of a struggle inside the house.

■ In sum, the government's case-in-chief on the homicide charge consisted primarily of the scientific and technical evidence described above together with testimony from witnesses who observed or spoke with appellant after the shooting. The theory of appellant's trial defense to this charge was one of self-defense. Although appellant did not take the witness stand, his defense theory was predicated in part upon the testimony of two defense witnesses who testified that on two occasions, outside of the presence of appellant, Jackson made threats against him. In addition, appellant relied upon his own statements, both those already referred to and others,[7] to indicate that Jackson attacked

*Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The officer could not have known that these words "were reasonably likely to elicit an incriminating response." *Id.* at 302, 100 S.Ct. at 1690 (footnote omitted). We add, however, that we reject as patently absurd the government's characterization of the officer's response as "a commonplace greeting." Hence its reliance upon *Morris v. United States,* 469 A.2d 432 (D.C.1983) is misplaced.

5. A black ankle holster was found on appellant's bed with no weapon in it.

6. The fatal bullet passed completely through decedent's neck. The presence of blood in the hallway indicated that Jackson was shot there.

7. Detective Clark read into evidence appellant's responses to questions posed by him after he had read appellant his rights and he agreed to answer questions. The detective testified:

Q. Tell me what happened.
A. My mother is deceased. He said something about my mother and we got to fighting. He drew a knife. I had a knife too and both of us was cutting. Both of us was high and drinking. All I could see was blades swinging. I don't know what happened.

Q. What did he call your mother?
A. He called my mother a MF.
Q. What kind of knife did he have?
A. Both of us had pocket knives.
Q. Where did this happen, at your house?
A. Yes.
Q. How do you feel now?
A. I think I'm going into DT's.
Q. Do you understand what I'm asking you?
A. Yes.
Q. Did you shoot him?
A. No.
Q. Did he hit you with a knife?
A. He tried.
Q. Were you both drinking at your house today?
A. Yes.
Q. Joseph, was there someone else at your house?
A. No.

The statement as read to the jury also contained the detective's observations that appellant was "suffering from withdrawals of alcohol and requested to go to the hospital."

In addition to these statements, Lawrence Shin, appellant's stepfather, testified that when he visited appellant in jail, appellant told him

him. The trial court, however, refused to instruct the jury on self-defense with respect to the homicide charge.[8]

## (1) COMMENT ON THE FAILURE TO TESTIFY

Nearly twenty years ago in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that comment by the prosecutor on the accused's silence violates the fifth amendment. *Id.* at 615, 85 S.Ct. at 1233. Based upon the following statements made by the prosecutor during opening, closing, and re-

that "Mr. Jackson jumped up and drew the gun on him.... They tussled and the gun went off."

**8.** Another of appellant's arguments is that the trial court erred in refusing to give the requested self-defense instruction. We disagree. Defense counsel's argument to the trial court in support of his requested instruction pointed only to the threats uttered by Jackson against appellant, but on appeal he relies additionally upon all of his statements admitted at trial. The government posits that because defense counsel did not bring to the trial court's attention the broader support for his argument, we should review the court's ruling under the plain error standard delineated in *Watts v. United States*, 362 A.2d 706 (D.C.1976) (en banc). We find, however, that defense counsel's objection was sufficiently precise as to call the issue to the court's attention thereby allowing full consideration of it based upon all the evidence. Case law establishes that an instruction on self-defense should be given upon request "if there is 'any evidence fairly tending to bear upon the issue' ...." *Belton v. United States*, 127 U.S. App.D.C. 201, 206, 382 F.2d 150, 155 (1967) (quoting *Stevenson v. United States*, 162 U.S. 313, 315, 323, 16 S.Ct. 839, 842, 40 L.Ed. 980 (1896)); *see Montgomery v. United States*, 384 A.2d 655, 660 (D.C.1978); *Rhodes v. United States*, 354 A.2d 863, 864 (D.C.1976). It bears emphasis that this is the standard by which to determine whether an instruction is to be given in the first instance. It is for the *jury* to determine whether a defendant had reasonable grounds to believe he was in imminent danger of bodily harm. While this issue raises a close question under these facts, we are not prepared to overturn the trial court's decision. We note that Jackson's threats were uttered in different contexts and were not heard by appellant. Moreover, we are of the view that the substance of appellant's statements raising the possibility of a struggle with Jackson were arguably incredible. The evidence belied that either of the two men fought with knives and it was clear

buttal arguments, appellant asserts that the government offended this constitutional principle. The prosecutor's opening statement included the following:

There are no witnesses that the government can produce in its case to that shooting, because, you see there were two people there that day, Mr. Bowler and Mr. Jackson.

And Mr. Jackson is dead now, so he can't talk.

During closing argument, he stated:

On February 21st of this year, as you know, at about 4:40 in the afternoon,

Jackson died from a gunshot wound. And, there was no physical evidence of a struggle. True, Shin's testimony as to what appellant later said sheds a more lucid and perhaps more sober light upon the incident. Nonetheless, the trial court was in the best position from which to reflect upon the evidence and assess whether a fair inference of self-defense was raised. On this record, we affirm that determination.

One final point must be made. Appellant argues that the trial court's refusal to instruct on self-defense penalized him for exercising his fifth amendment privilege not to testify. This postulation is meritless. Undoubtedly, the likelihood of a defendant introducing sufficient evidence to warrant a self-defense instruction is enhanced where the defendant himself testifies. But, the applicability of such an instruction is *not* precluded without a defendant's testimony. Under certain circumstances, such as those at bar where indirect evidence of self-defense is insufficient to support an instruction, that fact does not constitute a penalty upon the exercise of fifth amendment rights. Where the defendant alone can introduce evidence in support of his defense, "the constraint upon him to give testimony ... [arises] simply from the force of circumstances and not from any form of compulsion forbidden by the Constitution." *Yee Hem v. United States*, 268 U.S. 178, 185, 45 S.Ct. 470, 472, 69 L.Ed. 904 (1925); *see Barnes v. United States*, 412 U.S. 837, 847, 93 S.Ct. 2357, 2363, 37 L.Ed.2d 380 (1973) ("The more massing of evidence against a defendant cannot be regarded as a violation of his privilege against self-incrimination."); *Williams v. Florida*, 399 U.S. 78, 84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446 (1970) ("That the defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination."). In short, appellant remained free to testify or not as he so chose.

Claude Jackson was killed. And, as you also now know, Claude Jackson because he's dead can't come before you and tell you what happened.

\* \* \* \* \* \*

We will never know exactly what happened inside that apartment—inside that house. But we do know the following: We do know one man left that house ... and died, and he left the house as he was exiting the front door.

And finally, during rebuttal argument, the prosecutor said:

Over and over again he [defense counsel] said no one can say what happened concerning the shooting. Well, he's right. The government cannot bring the decedent in. The decedent is dead, I can't bring that person in here to tell you what happened.

\* \* \* \* \* \*

And also as to murder two on December—excuse me, on February 21st, because although we do not have any witnesses to what exactly happened inside, we do have enough evidence to show us that the person, that the defendant when he killed the decedent shot twice. Not once.

No objection was raised in open court or at the bench to the prosecutor's language.

■ The standard by which we determine the propriety of these statements is whether "the prosecutor's language 'was manifestly intended or was of such character that the jury would naturally and necessarily take it to be comment on failure to testify.'" *(Donnell) Watts v. United States*, 449 A.2d 308, 312 (D.C.1982) (quoting *Byrd v. United States*, 364 A.2d 1215, 1218 (D.C.1976)); *see, e.g., Wright v. United States*, 387 A.2d 582, 584–85 (D.C.1978); *Blango v. United States*, 335 A.2d 230, 232 (D.C.1975); *Peoples v. United States*, 329 A.2d 446, 450 (D.C.1974). There is no allegation of bad faith or intentional miscon-

duct on the part of the prosecutor so we may move directly to the second prong of the test. Accordingly, we will review the context in which the statements were made keeping in mind the underlying rationale of *Watts, supra*, and the precedent it relies on to determine whether the jury would naturally and necessarily have taken the statements to be comment on appellant's failure to testify.

Obviously the language employed in the opening statement could not have constituted a comment on the *failure* to testify, because it was unknown at that time whether appellant would take the witness stand. Indeed, the decision not to testify was apparently not resolved until after the defense's two witnesses testified.[9] Nonetheless, the prosecutor's language set the tone for his later statements which all served to harp on the fact that because Jackson was dead, no one would ever know what happened. The prosecutor's statements, moreover, were disingenuous. True, as the opening statement maintained, the *government* could produce no witnesses to the shooting; but it was clear by the close of evidence that the jury would never have an eyewitness account as to what happened. Nonetheless, the glaring unspoken fact alluded to time and again was that there was someone who was present in the house, who survived, and who presumably knew and could relate to the jury what happened. And, we find that the prosecutor's statements naturally and necessarily highlighted the fact that this person had failed to testify.

■ We recognized in *Watts, supra*, that even where a prosecutor's argument consists "of a reference to uncontradicted government evidence, the jury will not necessarily construe it as a comment on the defendant's silence unless the defendant's testimony is the only possible source of contradiction." 449 A.2d at 313 (citations omitted). Thus, in *Wright v. United*

---

**9.** Evidently, appellant chose not to testify so as to avoid impeachment based upon his prior criminal record.

*States, supra,* we found no error in the prosecutor's refutation of defendant's alibi defense in which he pointed out that no testimony placed defendant at a location other than that where the crime occurred because "the jury had no reason to believe that [defendant] alone could verify his presence at the restaurant during the critical time period." 387 A.2d at 585. *See Christian v. United States,* 394 A.2d 1, 33 n.86 (D.C.1978) (prosecutor may argue that the government's evidence is uncontradicted so long as he does not directly implicate defendant's failure to testify); *cf. Manago v. United States,* 331 A.2d 335, 337 (D.C. 1975) (prosecutor's argument that "[a]ll of the evidence came from the government" did not constitute plain error where it was "a passing reference to the fact that the evidence was uncontroverted"). But in *White v. United States,* 248 A.2d 825 (D.C. 1969), we held that the prosecutor's statement that the government's testimony was uncontradicted provided a basis for reversal because only defendant and two officers (who both testified) were present when the incident occurred. *Id.* at 826 & n.2. Under the circumstances before us, we find that the prosecutor's repeated statements were the functional equivalent of assertions that the government's evidence was uncontradicted, from which it was all too clear that only appellant could have contradicted it. *See Watts, supra,* 449 A.2d at 313; *White, supra,* 248 A.2d at 826.

▮ While we have concluded that the prosecutor's statements were tantamount to comment on appellant's failure to testify, we are not convinced that this error alone requires reversal on the basis of the record at bar. *See Chapman v. California,* 386 U.S. 18, 20, 24, 87 S.Ct. 824, 826, 828, 17 L.Ed.2d 705 (1967); *Brown v. United States,* 383 A.2d 1082, 1085 (D.C.1978). Nonetheless, we find that this error is but one in a myriad of errors which so preju-

diced the jury as to deny appellant a fair trial on the charge of second-degree murder. *See infra* pp. 685–686.

## (2) THE MARITAL PRIVILEGE

The prosecutor summoned Elsie May Linder to testify as part of the government's case-in-chief and on rebuttal. In so doing, however, we conclude that testimony was elicited from her in contravention of the marital privilege protected under D.C. Code § 14–306 (1981).[10]

The prosecutor sought Linder's testimony as to the December 24, 1981 assaults on Pamela Bowler and Claude Jackson to which she apparently was a witness. On direct examination, Linder introduced herself as appellant's common law wife and indicated she had lived with him for three and one-half years. That testimony was unrefuted and unimpeached. She testified that on December 24th, she had a fight with appellant and ran downstairs to the room shared by Bowler and Jackson where appellant came to get her. At this point, however, Linder no longer wanted to continue testifying. The record indicates the following interchange between Linder and the prosecutor:

Q. You don't want to testify here against him [appellant]; do you?

A. No, I do not because I don't figure I should because I consider Joseph as my husband and I don't think I should testify against him.

Q. Well, no one is asking you any questions about any conversations you had with him. I am only asking you what you saw.

A. I didn't see anything, sir.

The record further indicates that Linder had spoken to the prosecutor immediately prior to trial and had informed him then that she "didn't want to testify." Nonetheless the prosecutor continued, albeit unsuc-

10. The statute provides:
(a) In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.

(b) In civil and criminal proceedings, a husband or his wife is not competent to testify as to any confidential communications made by one to the other during the marriage.

cessfully,[11] to elicit testimony without objection from either the court or defense counsel.

 The marital privilege as defined in § 14–306(a), *supra*, note 10, clearly provides that the testifying spouse may not be compelled to testify for or against the other spouse. Though we have never held that the privilege applies to common law marriages recognized by the District of Columbia, *Johnson v. Young*, 372 A.2d 992, 994 (D.C.1977); *McCoy v. District of Columbia*, 256 A.2d 908, 909–10 (D.C. 1969), we find no basis in law or reason to hold that the privilege does not so apply. As indicated above, Linder's assertion that she was appellant's common law wife was undisputed. Thus, we conclude that the prosecutor's direct examination violated the statute safeguarding her privilege not to testify. Furthermore, the government's argument that appellant's failure to object to the questioning at trial by raising the privilege constituted a waiver of any allegation of error on appeal, is unpersuasive. In *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63, L.Ed.2d 186 (1980), the Supreme Court made clear that the privilege belongs only to the *witness* spouse. *Id.* at 53, 100 S.Ct. at 913. Thus, the matter before us is not one of waiver but rather of a statutory violation as it impacted upon the fairness of appellant's trial. *See infra* pp. 685–686.

 In light of the fact that a violation of the marital privilege went unnoticed or was indeed erroneously rejected by the court, defense counsel and the government,[12] we take this opportunity to revitalize the instruction given by the District of Columbia Circuit Court of Appeals in *Postom v. United States*, 116 U.S.App.D.C. 219, 322 F.2d 432 (1963), *cert. denied*, 376 U.S. 917, 84 S.Ct. 672, 11 L.Ed.2d 613 (1964) that:

> Because of [§ 14–306], we think that, outside the presence of the jury, the trial judge should tell one who is called to testify for or against his spouse that his testimony cannot be compelled but may be received if volunteered.

*Id.* at 221, 322 F.2d at 434 (footnote omitted). This statement is binding upon us under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), and was recently reaffirmed by the circuit court in *United States v. Lewis*, 140 U.S.App.D.C. 40, 44 & n.13, 433 F.2d 1146, 1150 & n.13 (1970). Linder's protestations, particularly those voiced *before* the commencement of trial, should not have been ignored.

(3) CLOSING AND REBUTTAL ARGUMENTS

Appellant further alleges numerous instances of prosecutorial misconduct during closing and rebuttal arguments wherein the prosecutor expressed his personal opinion on the credibility of certain witnesses, inflamed the jury with gory and graphic details of the death scene and by waiving the revolver, and drew inferences as to witnesses' conduct and testimony which were not based upon evidence introduced at trial. We find it unnecessary to address each of appellant's contentions. Instead, we focus primarily on the most egregious statements concerning Linder's testimony which constituted plain error.

In an apparent effort to explain Linder's refusal to testify as to incidents concerning appellant yet to solidify her testimony on other points, the following remarks were

---

**11.** It is arguable that the testimony ultimately elicited was harmful to the government's case. This fact, however, does not affect our ruling. Moreover, we find it to be irrelevant that the prosecutor persisted in his efforts because he anticipated Linder's testimony to have been in support of the government's case.

**12.** During Linder's testimony on rebuttal, a colloquy transpired at the bench in which the prosecutor stated and the court agreed that Linder did not have the right to refuse to testify against appellant because "they're not in marital communications." From this we may assume that at this later stage in the trial, applicability of the privilege was, however briefly, raised. The record does not indicate that defense counsel's motion for mistrial made at that time was in any way based on the marital privilege.

made by the prosecutor during closing argument:

> When you remember, some of that testimony had to rely on Elsie Mae [Linder] herself. Was she the type of woman who was going to testify against this man. Well, she told you repeatedly she would not. She wouldn't testify against him. So when you look at her testimony you really have to do a mental cutting in half. Everything dealing with people other than the defendant, I submit to you, you have to look at it, and she was quite credible. She was honest. She hung her head and said she was sorry about certain events, but her testimony was truthful. When it dealt with the defendant, she told you right at the beginning she wasn't going to testify against that man.

We need not further belabor the point that Linder's decision not to testify against her common law husband was protected by statutory privilege. As such, it was wholly improper for the prosecutor to further highlight her refusal and to use it as a means to buttress the government's impeachment of her arguably adverse testimony concerning the alleged assaults on December 24, 1981, *see supra* note 11, and to juxtapose it as a basis upon which the jury might credit her other testimony (not concerning appellant) which went to the charge of homicide. In particular, these statements laid the groundwork for further argument from which we find the plain inference that Linder did not testify because she was afraid of appellant—an inference unsupported by the evidence, *compare Powell v. United States*, 455 A.2d 405, 409 (D.C.1982) *with Arnold v. United States*, 467 A.2d 136, 138 (D.C.1983), and untenable in light of the marital privilege.[13] This inference more forcefully emerged from the prosecutor's statements which promptly followed. The prosecutor added:

> The defense put on two witnesses to tell us what a terrible person Junior

[Jackson] was. And what did you hear about Junior from those two witnesses? That on two occasions he said that the defendant was an S.O.B. and deserved to get it.

> And what were the occasions? Both times dealt [with] when the defendant had been beating on Elsie Mae. How many of you? You saw it, you saw the woman sitting up here, you saw what she looked like. You had an opportunity to take a good look at her whole body. Took a good look at her face. How many of you would have said the same thing?

Clearly, we cannot project from the bare record a picture of Linder's appearance. But what we find unmistakable is the implication that whatever scars or disfigurement existed on Linder's face and body were attributable to appellant. The prosecutor could properly point out the information he had elicited on cross-examination of the two defense witnesses, that Jackson's threats against appellant were apparently uttered after appellant fought with Linder. But, the language used was both misleading and unreasonable, *see Powell, supra,* 455 A.2d at 409, and served to depict appellant simply as a wifebeater.

 Where, as here, we have found prosecutorial misconduct, this court will reverse only if the errors created "'substantial prejudice'" to appellant. *Dyson v. United States*, 450 A.2d 432, 437 (D.C. 1982); *see Arnold, supra,* 467 A.2d at 137, *Powell, supra,* 455 A.2d at 411. Thus, in ruling whether the misconduct infected the jury's verdict we must analyze the "closeness of the case; the nature of the misconduct and its centrality *vel non* to the case; whether there was defense objection; and, the steps taken by the trial court to lessen the impact of the misconduct." *Fornah v. United States*, 460 A.2d 556, 560 (D.C. 1983) (citations omitted); *see Powell, su-*

---

**13.** There are many reasons a witness may choose not to testify. The impropriety of the inference herein is readily borne out by the fact that Linder may have refused to testify against appellant out of love, not fear.

*pra,* 455 A.2d at 411; *Dyson, supra,* 450 A.2d at 437–38. Defense counsel raised no objection to any of the prosecutor's arguments. Thus the plain error standard is mandated. *Watts v. United States, supra* note 8, 362 A.2d 706. In addition, the trial court instructed the jury that the facts and argument of counsel are not evidence. (The prosecutor had made this same remark during closing argument.) Moreover, we find that the strength of the government's case was overwhelming. Appellant and Jackson were alone in the house when Jackson was shot in the hallway on the first floor. Jackson told Betty Joyner that appellant shot him. Appellant told Joyner, albeit inaccurately, that he "stabbed" Jackson and he later asked Lawrence Shin to retrieve a gun from his bedroom. Other evidence also supported the commission of a homicide. *See supra* pp. 680–681. But here, we draw a critical distinction; the evidence was amply strong as to the crime of *manslaughter,* not to the crime of murder in the second degree.[14] These crimes are distinguished by the sole element of malice necessary to a verdict of second-degree murder. *See United States v. Alexander,* 152 U.S.App.D.C. 371, 471 F.2d 923, *cert. denied,* 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972). And we conclude that the prosecutorial misconduct bore directly on the issue of malice. Malice has been defined as "a state of mind showing a heart that is without regard for the life and safety of others." *United States v. Hinkle,* 159 U.S.App.D.C. 334, 336, 487 F.2d 1205, 1207 (1973). The prosecutor's persistent efforts to elicit testimony from Linder in conjunction with the statements made in closing argument explaining her refusal resulted in the inference that Linder feared appellant. The further references to Linder's face and body provided a basis for such fear and imputed to appellant a violent and malicious character. Therefore, we hold that these errors, considered along with the prosecutor's improp-

er comment on appellant's silence, contaminated the jury's deliberations on the element of malice. *Cf. Fornah, supra,* 460 A.2d at 562 (error in prosecutor's closing argument did not require reversal where jury found appellant guilty of involuntary manslaughter, not murder).

■ We recognize the government's responsibility to prosecute zealously. *Powell v. United States, supra,* 455 A.2d at 408. We also are aware that while in the midst of a trial, it is often difficult to appreciate the strength of the evidence introduced and to gain a perspective as to what constitutes proper bases for argument. Despite these inevitable rigors of trial practice, when we are confronted with a case such as this one, replete with improper arguments and examinations, we must register, without reservation, our disapproval of such improprieties. The government's role in a criminal prosecution is not solely (if at all) that of giving the public the most for its money. On this record the strength of the government's case is evident, and should have been just as evident before trial, as to the offense of manslaughter. Overzealous prosecution geared to a conviction for murder in the second degree is impermissible at the expense of an accused's right to a fair trial. We therefore conclude that the cumulative instances of prosecutorial misconduct deprived appellant of a fair trial on the charge of murder in the second degree. Accordingly, we reverse and remand for retrial on the charge of murder in the second degree or for entry of a judgment of conviction for manslaughter with directions for resentencing. *Cf. Moore v. United States,* 388 A.2d 889, 892 (D.C. 1978) (where evidence supported petit, but not grand, larceny, appropriate disposition is to reverse grand larceny conviction and remand for entry of judgment of conviction for petit larceny); *United States v.*

---

14. As previously noted, the jury was instructed both on the charge of murder in the second degree and the lesser-included offense of manslaughter. *See United States v. Branch,* 382 A.2d 1033, 1035 n.1 (D.C.1978).

*Thweatt,* 140 U.S.App.D.C. 120, 128–29, 433 F.2d 1226, 1234–35 (1970) (same).

*Reversed and remanded.*

GALLAGHER, Associate Judge, Retired, concurring and dissenting statement:

I do not agree with the majority that the prosecutor's statements "were tantamount to comment on appellant's failure to testify." The prohibition on such comment is being stretched too far. The comment in this case came more nearly under our ruling in *Christian v. United States,* 394 A.2d 1, 33 n.86 (D.C.1978). The comments were "within the bounds of reasonable advocacy" and were not of such a character that the jury would necessarily take them to be a comment on the failure of the defendant to testify.

I do agree, however, that there was prejudicial error when, notwithstanding the marital privilege, the prosecutor attacked the witness Elsie Mae Linder during closing argument for her refusal to testify against appellant, her common-law husband. I agree that the marital privilege applies to common-law marriages and that here Linder effectively asserted that privilege. However, violation of the privilege does not always warrant reversal. Rather, the testimony elicited in violation of the privilege must be assessed under a harmless error analysis to determine if prejudice resulted. *See United States v. Pariente,* 558 F.2d 1186, 1190 (5th Cir.1977).

Ms. Linder testified that appellant was not the initial aggressor in an assault that preceded the shooting in question. This tended to negate the "malice" element of second degree murder and therefore clearly did not prejudice appellant. This testimony, although obtained in violation of the marital privilege, was harmless.

I view as prejudicial, however, the prosecutor's comments in closing argument in reference to Linder's hesitancy to testify against appellant. The comments amounted to use of Linder's unsuccessful assertion of the marital privilege for impeachment purposes. The government's evi-

dence that appellant acted with malice was weak, and Linder's testimony tended to counter that evidence. Given the importance of Linder's testimony to appellant's case, I do not view the improper credibility attack as harmless. I, therefore, join in the court's disposition of this case.