Benjamin EGBUKA, Appellant,

v.

UNITED STATES, Appellee.

No. 99–CF–1700.

District of Columbia Court of Appeals.

Argued Feb. 10, 2009.
Decided April 2, 2009.

Kyle A. McGonigal, with whom Marc L. Resnick was on the brief, for appellant.

John P. Gidez, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, Chrisellen R. Kolb, and Jonathan M. Malis, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, THOMPSON, and OBERLY, Associate Judges.

OBERLY, Associate Judge:

Appellant Benjamin Egbuka was convicted of Simple Assault, Attempted Threats, and Attempted Possession of a Prohibited Weapon, in violation of D.C.Code §§ 22–504, 22–507, and 22–3214(b) (1981). He was sentenced to 180 days' imprisonment on each count, which was suspended in favor of time served (approximately 30 days), and two years of supervised probation, which was terminated by the trial judge eight months early. He argues for reversal of his convictions on the grounds that (1) substantial portions of the trial transcript are unavailable, impairing both his new appellate counsel's ability to mount an effective appeal and this court's ability to conduct a meaningful review of the case, and (2) the trial judge committed reversible error by failing to inform the complaining witness of her spousal privilege not to testify against him. We agree on both counts. We conclude both that the deficiencies in the record prevent us from performing our appellate function properly, and that, based on the record that is available to us, the trial judge erred in the basis for his refusal to advise the complaining witness of her spousal privilege. Accordingly, we reverse and remand for the government to decide whether it wishes to retry this decade-old case.

## I. STATEMENT OF FACTS

This case was tried by the court, sitting without a jury. Large portions of the trial transcript—approximately 40 per cent—were never transcribed because of an apparent malfunction of the recording equipment. Of the six days of trial proceedings in October and November 1999, only two days were recorded in their entirety. To provide this court with a sufficient record of the trial, this court remanded the case to the trial court with instructions to reconstruct the trial record pursuant to District of Columbia Court of Appeals Rule

10(d).[1] Under the version of D.C.App. R. 10(d)(1) applicable to the present appeal, [i]n extraordinary circumstances, with special leave of this court, the appellant may prepare a statement of the proceedings and evidence from the best available means, including the recollection of counsel, in lieu of the reporter's transcript.

Between the time of trial and this court's remand, the trial judge, Judge Reggie B. Walton, retired from the Superior Court and was appointed to the federal bench, and Superior Court Judge Herbert B. Dixon, Jr., assumed responsibility for this case. In an effort to reconstruct the record of this trial, over which he did not preside, Judge Dixon reviewed contemporaneous trial notes from Judge Walton, the Assistant United States Attorney who tried the case for the government, and a law student intern for the United States Attorney's office who was present during the trial. In addition, Judge Dixon received post-hoc letters from Egbuka's trial counsel, Egbuka himself, and counsel for Ms. Dana Beepath–Hardy, who was the alleged victim and a government witness at trial. These letters were not particularly helpful in reconstructing the trial record because none of these persons had kept contemporaneous notes and none had a detailed recollection of the trial four years earlier.

After reviewing submissions from both parties, Judge Dixon issued an Order on October 31, 2006, in which he approved and certified the Substitute Statement of Proceedings and Evidence ("Substitute Statement" or "SPE"). Egbuka's appellate counsel opposed the court's certification of the Substitute Statement as a sufficient and accurate record of the trial proceedings. We review Egbuka's objections in Section II of this opinion, but we pause here to set forth the facts of the case according to the Substitute Statement and the available transcripts.

Egbuka and Beepath–Hardy had been involved in a relationship for several years when Egbuka, a Specialist in the United States Army, was transferred to a post in South Korea. Beepath–Hardy often called Egbuka while he was in South Korea and, during one phone call, threatened to kill herself. Worried about Beepath–Hardy's mental state, Egbuka flew back to the United States to see her.

On September 18, 1998, Egbuka and Beepath–Hardy were involved in an altercation in front of Beepath–Hardy's apartment building on Georgia Avenue in Northwest Washington, D.C. Although accounts vary, it appears that Egbuka surprised Beepath–Hardy by approaching her in front of her apartment building as she walked home from work. Jemma Raymond, Beepath–Hardy's neighbor and a government witness, testified that she heard Beepath–Hardy call for help and, as Raymond looked outside, she saw Egbuka chasing Beepath–Hardy toward Raymond's building. Raymond then saw Egbuka grab Beepath–Hardy and push her against a wall. Raymond called the police while still watching the events through her apartment window. Raymond saw Egbuka "wave a gun around" as he continued to talk to Beepath–Hardy, but she did not see Egbuka point the gun at Beepath–Hardy at any time. Two police officers arrived on the scene, by which time Egbuka and Beepath–Hardy were conversing with each

---

1. References to Rule 10(d) are to the 1998 edition of the District of Columbia Court Rules, because the present appeal was filed prior to January 2, 2004, when the rule was recodified as D.C.App. R. 10(c). Although the current version and prior version of the rule differ somewhat, the differences do not alter the disposition of the issue now before the court.

other. One police officer found what he described as a "replica BB gun" in Egbuka's possession. The police later arrested Egbuka.

In February 1999, between the time she testified about the incident in front of a grand jury and when she was called by the government to testify at Egbuka's trial, Beepath–Hardy married Egbuka. According to the Substitute Statement, the government offered Beepath–Hardy use immunity for her testimony and, after consulting with her court-appointed counsel, Beepath–Hardy accepted the offer on October 6, 1999. The in-court discussion of this event is missing from the trial transcript.

Later, when the government called Beepath–Hardy to the stand, the Assistant United States Attorney informed Judge Walton that there was a potential marital privilege issue with Beepath–Hardy's testimony because she was married to the defendant. Judge Walton determined he had no obligation to advise Beepath–Hardy of the privilege, a ruling to which Egbuka's counsel objected. According to the SPE, Judge Walton took a recess to consider the issue further and returned to the courtroom to rule that under the D.C. Intrafamily Offenses Act, D.C.Code § 16–1005(b), Beepath–Hardy's marital privilege could be "overridden" and he again declined to advise Beepath–Hardy of her marital privilege. The entire discussion of the spousal privilege issue and Judge Walton's rulings are missing from the transcript.

Based on Judge Walton's decision not to advise Beepath–Hardy of her spousal privilege, the government moved forward with its direct examination of Beepath–Hardy and, after another sidebar between the court and counsel, the transcript of which is also unavailable, impeached her trial testimony with portions of her prior grand jury testimony. During her grand jury testimony, Beepath–Hardy had testified

that Egbuka "held onto [her] arm and started pulling [her] towards [sic] the apartment door." She testified that she had struggled with him and he had hit her on her forehead with his right arm. She also testified that Egbuka had bitten her neck during their encounter.

In contrast, Beepath–Hardy's trial testimony fully exonerated Egbuka. Beepath–Hardy denied that Egbuka had pulled, pushed, or bitten her during their conversation outside her building, and she stated that she had not struggled with him. Beepath–Hardy testified that Egbuka had surprised her in front of her building, the two of them had hugged, and then had talked for less than five minutes.

Judge Walton found Beepath–Hardy's trial testimony incredible, and instead credited her grand jury testimony. In addition, he found it illogical that Egbuka would fly home to Washington, D.C., from South Korea out of concern for Beepath–Hardy's well-being and yet not let her know that he was coming. In contrast, Judge Walton credited Raymond's version of the events, finding that her testimony "clearly reveal[ed] circumstances that are totally consistent with what the complaining witness told the grand jury had taken place." He found that "[i]t is totally absurd to believe the tale of falsehoods that have been presented to me in support of a theory of innocence here," and concluded that "the government has in fact sustained its burden and therefore [I] would find the defendant guilty of all of the offenses."

## II. ANALYSIS

### A. APPELLANT'S EFFORTS TO PRODUCE A SUBSTITUTE STATEMENT OF PROCEEDINGS AND EVIDENCE TO SUPPLEMENT AN INCOMPLETE RECORD ON APPEAL

All too often, cases come to this court with significant portions of the trial

record missing, notwithstanding Super. Ct.Crim. R. 36–I(a) (the trial court is required to keep a simultaneous, verbatim record of its proceedings). The absence of a complete transcript of the trial does not automatically mandate reversal, however, even if it makes appellate review more difficult. *See, e.g., David v. United States,* 957 A.2d 4, 6 (D.C.2008); *Lucas v. United States,* 476 A.2d 1140, 1142 (D.C.1984). Instead, our cases make clear that the "question in each case is whether the particular omission from the transcript *prejudices* the defendant's right to appeal." *Lucas,* 476 A.2d at 1142. Prejudice may be shown in one of two ways: (1) first, by raising a specific claim of error and showing that it is impossible for this court to determine from the available record whether or not prejudicial error occurred; or (2) second, by showing that, even if no specific error is claimed, the omission in the transcript prevents new appellate counsel from reviewing a substantial or crucial portion of the trial proceedings to determine whether error occurred. *Id.; see also Romero v. United States,* 956 A.2d 664, 668 (D.C.2008).

 In either event, the burden remains on appellant to make reasonable efforts to prepare a substitute statement for approval by the trial court. *David,* 957 A.2d at 6–7. Here, Egbuka, through his first appellate counsel, made Herculean efforts but was thwarted at virtually every turn. According to status reports filed with this court over a period of many years, when counsel was first appointed to represent Egbuka on appeal, he ascertained that trial counsel had properly ordered the entire trial transcript contemporaneously with the filing of the notice of appeal. After approximately six months had passed, appellate counsel began calling the Court Reporting Division of the Superior Court to inquire about the availability

of the transcript. He was told, on numerous occasions, that the press of other business was causing delay but that the transcript of Egbuka's trial would be available "in due course." After several such calls, appellate counsel started calling the supervisor and director of the division. In one of those calls, nearly a year after his first call to the Court Reporting Division, counsel was told, for the first time, that there was "trouble" with the transcript tapes and that "reconstruction" of inaudible portions would be attempted by sending the tapes to a facility in Phoenix, Arizona, for that purpose. Counsel accepted that report as accurate, although he later was told that tapes have not been sent to Phoenix since 1998 (prior to Egbuka's trial), when reconstruction technology was set up on-site at the Superior Court.

In any event, the results of the reconstruction efforts were not particularly successful. Appellate counsel obtained the transcripts that were available on or about August 1, 2001, not quite two years after Egbuka's trial and conviction. Upon review of the available transcripts, appellate counsel learned that the portion of trial days for which there is either no transcript or only a partial transcript represented more than 40 per cent of Egbuka's trial. Missing portions of the transcript include but are not limited to: (1) the entire direct examination of the government's eyewitness, Jemma Raymond; (2) a significant portion of the cross-examination of Raymond; (3) the first day of the direct examination of the complaining witness, Beepath–Hardy (who was Egbuka's spouse by the time of trial); and (4) discussion between the trial judge and counsel of use immunity for the complaining witness and the availability of the spousal privilege to permit Beepath–Hardy to decline to testify against Egbuka.

Upon realizing how much of the transcript was unavailable and recognizing that his attempts to represent Egbuka on appeal would be severely hampered, appellate counsel contacted appellate counsel for the government seeking his assistance in efforts to prepare a substitute statement under Rule 10(d). Counsel also attempted to contact trial counsel for Egbuka. After several false starts, some caused by the listing of the wrong attorney's name in the transcript (such as it was), Egbuka's appellate counsel reached Egbuka's trial counsel, whose recollection of the details of the trial was sparse. Egbuka's appellate counsel also contacted Judge Walton's chambers and learned that Judge Walton had about ten pages of notes he had taken during the trial. Counsel asked that those notes be provided to him, and Judge Walton did so. Judge Walton's notes, although reasonably thorough, did not contain any reference to the issues of spousal privilege or use immunity for Beepath–Hardy.

In February 2002, appellate counsel filed a motion to set aside the judgment of conviction because of the infeasibility of reliable reconstruction of the trial proceedings or, alternatively, to remand to the trial court for a formal attempt to prepare a substitute statement of proceedings under Rule 10(d). On April 23, 2002, this court denied Egbuka's motion to set aside the judgment but granted his alternative motion to remand the case for reconstruction of the evidence and proceedings.

There ensued a period of over four and one-half years, until October 30, 2006, before Judge Dixon filed an Order constituting a Substitute Statement of Proceedings and Evidence under D.C.App. R. 10. During that interval, appellant and the government exchanged versions of a proposed substitute statement but were unable to agree on a joint submission. Judge Dixon ultimately drafted the SPE drawing upon all available materials. Thereafter, the record on appeal was completed and this court established a briefing schedule for Egbuka's appeal from his 1999 judgment of conviction.

We have recounted the tortuous path of Egbuka's case from the filing of the notice of appeal to this court's consideration of his claims of error in some detail because it is clear that this case is at the opposite end of the spectrum from one in which the appellant "refuses to make reasonable efforts to prepare a [substitute] statement." *Cole v. United States,* 478 A.2d 277, 284 (D.C.1984). Egbuka, through counsel, did everything reasonably possible to produce a complete record for this court's review on appeal but was thwarted by factors beyond his control.

### B. INADEQUACY OF THE SUBSTITUTE STATEMENT OF PROCEEDINGS AND EVIDENCE TO PERMIT MEANINGFUL REVIEW ON APPEAL IN THIS CASE

█ Of course, it is not enough to show that appellant met his obligation to produce a substitute statement. He must also show that the substitute statement, though produced by the best available means, is inadequate to permit meaningful appellate review. *Cole,* 478 A.2d at 285. We are convinced that appellant has made that showing here.

First, critical portions of the transcript were never able to be reconstructed. These include the trial court's ruling refusing to instruct Beepath–Hardy about her spousal privilege not to testify against Egbuka; the discussion between the court and counsel about the government's grant of use immunity to Beepath–Hardy prior to her testimony; the entire direct testimony of the eyewitness, Jemma Raymond;

and significant portions of the cross-examination of Raymond. Other portions of the transcript were missing as well, but these portions alone are sufficient to convince us that appellant's counsel—new to this case on appeal—cannot mount an effective case for his client.

Second, the passage of time meant that the drafting of the substitute statement of proceedings fell to a judge who did not preside over the trial. Although Judge Walton's trial notes were made available to Judge Dixon, still there is no escaping the fact that Judge Dixon was not at the trial. There is no reason to doubt the accuracy of Judge Walton's notes, but they reflect only that which he thought important to note for his own purposes at trial, and of course he had no reason to suppose that they would later be used by others in lieu of a complete transcript of the trial. Moreover, it is obvious that Judge Walton's notes could not have served as a "memory-jogger" for a judge who was not present at the trial. Several of our cases, in commenting on the sources available to a trial court tasked with constructing a substitute statement, note that the court may "rely on *its* own recollection or notes from trial." *Cole,* 478 A.2d at 284–85 (emphasis added); *see also Romero v. United States,* 956 A.2d at 667, 668 (the trial judge had taken detailed notes on witness's testimony during trial and believed he had a good memory of the case, so he read his notes into the record during the record reconstruction process. The *Romero* court

noted that because the trial court has the ultimate responsibility to ensure an adequate record for review, it may supplement the appellant's statement with its own recollection or trial notes, citing *Cole,* 478 A.2d at 284–85). Clearly, these cases do not contemplate that a trial judge other than the judge who presided over the trial will be tasked with preparing the substitute statement. Although that was the unavoidable result in the present case due to Judge Walton's appointment to the federal bench, we are left with a more problematic reconstruction of the trial than would be the case had he been able to perform the task himself.[2]

Third, the passage of time also meant that only the notes of the Assistant United States Attorney who tried the case and a law student intern working in the U.S. Attorney's Office were available for use by Judge Dixon. Moreover, by the time of the reconstruction by Judge Dixon, even the Assistant United States Attorney acknowledged that he had only "limited independent memories of the proceeding." *Cf. United States v. Workcuff,* 137 U.S.App. D.C. 263, 265, 422 F.2d 700, 702 (1970) ("It is difficult enough in normal circumstances to appraise the propriety of the trial court's various actions on the basis of a cold printed record; when that record is replaced by the incomplete hearsay recollections of one of the parties, our review is turned into an exercise in creative imagination.").

2. We note that it might have been possible to seek to have the reconstruction of the missing trial record in this case performed by Judge Walton, pursuant to 28 U.S.C. § 292(c) (authorizing the chief judge of the United States Court of Appeals for the District of Columbia Circuit to designate and assign temporarily any district judge of the circuit to serve as a judge of the District of Columbia Superior Court when approved by the Attorney General of the United States as necessary to meet the

ends of justice). *See also* D.C.Code § 11–908(c) (2001) (companion provision). We do not suggest that this procedure is feasible in this case at this late date, nor do we suggest that, had it been followed, it would have addressed the other problems in this case that we discuss in text, but awareness of this statutory procedure might be of benefit to the Superior Court should it confront a similar situation in the future.

What is more, neither Egbuka nor his trial counsel nor counsel for Beepath–Hardy were able to recall the events of the trial in sufficient detail to assist in the preparation of the substitute statement. While we have never held that the reliability of a substitute statement must be measured by Sixth Amendment precepts of adversarial presentation at trial, we note the lopsidedness of the reconstruction here and contrast it with what the Supreme Court has observed in a related context. *See United States v. Cronic,* 466 U.S. 648, 655, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (" 'Truth,' Lord Eldon said, 'is best discovered by powerful statements on both sides of the question.' ") (quoting Kaufman, Does the Judge Have a Right to Qualified Counsel?, 61 A.B.A.J. 569, 569 (1975)).

■ Fourth, Egbuka's appellate counsel was not his trial counsel. This factor is of critical importance. As we said in *Cole,* 478 A.2d at 287 (footnote omitted):

> The increased likelihood that prejudice will result when a newly-retained appellate counsel is forced to proceed with a less-than-complete transcript of the trial court proceedings is well-recognized. An appellate counsel who was not present at trial and does not have access to a transcript of the trial court proceedings will be forced to piece together the events of trial, relying solely on the recollections of others. This will leave counsel at a disadvantage both in uncovering trial court errors and in developing a substitute statement of evidence sufficient to demonstrate that such errors merit reversal.

In *Cole,* in which the defendant also was represented by new counsel on appeal, we concluded that the SPE lacked both the "completeness and the reliability necessary to protect appellant's right to pursue an appeal and this court's obligation to engage in meaningful review." 478 A.2d at 287. We reach the same conclusion here and, as in *Cole,* we reverse appellant's convictions.

■ As in *Cole,* we find the deficiencies in the reconstructed record sufficient, in and of themselves, to require reversal. Although appellant has an obligation to try to reconstruct the record, and the trial judge has the ultimate responsibility to certify a substitute statement as adequate for appeal, where the trial judge is unable to settle and approve a substitute statement, it must set aside the judgment and permit a new trial. *See Cross v. District of Columbia,* 292 A.2d 794 (D.C.1972). In short, there are situations where even the best available means are simply not good enough to permit meaningful representation and review on appeal. Were there any doubt on that score, however, we are further persuaded that reversal is required by the one significant error that Egbuka's new counsel has been able to develop even though handicapped by the absence of the complete transcript.

## C. THE TRIAL COURT ERRONEOUSLY ALLOWED THE GOVERNMENT TO QUESTION BEEPATH–HARDY WITHOUT ADVISING HER OF HER SPOUSAL PRIVILEGE

The government urges us to reject Egbuka's objection to the trial court's refusal to instruct Beepath–Hardy that she had a spousal privilege not to testify against Egbuka because Egbuka lacks standing to assert Beepath–Hardy's privilege. We recognize that our cases typically hold that "the marital privilege belongs to the witness spouse, and may not be asserted by the spouse against whom the testimony is being offered." *Johnson v. United States,* 616 A.2d 1216, 1222 (D.C.1992); *see also Bowler v. United States,* 480 A.2d 678, 685 (D.C.1984); *Postom v. United States,* 116

U.S.App. D.C. 219, 220, 322 F.2d 432, 433 (1963).

Here, however, we believe the government's argument is too facile. Egbuka's position does not depend on his attempted assertion of Beepath–Hardy's privilege but, rather, on his objection to Judge Walton's ruling that he was not obligated to advise Beepath–Hardy that she could invoke the spousal privilege. Egbuka argues that Judge Walton based that ruling on an erroneous belief that the Intrafamily Offenses Act, D.C.Code § 16–1005(b) (1981), makes the spousal privilege inapplicable even when one spouse is called to testify against his or her marital partner in a criminal case. The Act provides that, notwithstanding the spousal privilege recognized in D.C.Code § 14–306 (1981),[3] "one spouse shall be a competent and compellable witness against the other and may testify as to confidential communications, *but testimony compelled shall be inadmissible in evidence in a criminal trial* over the objection of a spouse entitled to claim that privilege." (Emphasis added.)

We agree with Egbuka that Judge Walton would have been wrong to rule that the Act rendered Beepath–Hardy's spousal privilege unavailable in a criminal proceeding against Egbuka. On the contrary, the text of the Intrafamily Offenses Act provides just the opposite, and the prosecutor's notes of the trial called the basis for Judge Walton's ruling "odd" (although Judge Dixon did not mention that characterization in the Substitute Statement). Thus, if that was indeed the basis on which Judge Walton decided not to tell Beepath–Hardy of her privilege, he erred. Of course, as the government is forced to concede, we do not know why Judge Walton ruled as he did because the basis for his ruling, if he offered one at all, is contained in a portion of the transcript that is missing.

■ For purposes of this appeal, however, we will assume, as do both parties, that Judge Walton decided not to tell Beepath–Hardy of her spousal privilege because of an erroneous reliance on the Intrafamily Offenses Act. Thus, the question becomes what should Judge Walton have done had he not misapplied the Act. On that point, our cases make clear that he should have told Beepath–Hardy of her spousal privilege not to testify. *See, e.g., Bowler,* 480 A.2d at 685 (quoting *Postom,* 116 U.S.App. D.C. at 221, 322 F.2d at 434 (1963) ("[O]utside the presence of the jury, the trial judge should tell one who is called to testify for or against his spouse that his testimony cannot be compelled but may be received if volunteered.")); *see also Jackson v. United States,* 623 A.2d 571, 584 (D.C.1993) ("Had the potential for [spousal] privilege been clear, it would have been incumbent upon the court to address the witness and to inform her that she could not be compelled to testify.").

■ The trial judge did not so advise Beepath–Hardy but, as noted above, the government would foreclose Egbuka's challenge by arguing that he lacks standing. As this court recognized in *Bowler,* however, Egbuka's challenge should not be analyzed under the rubric of standing. Instead, the statutory privilege created by D.C.Code § 14–306 is violated when the privilege is not properly recognized. In *Bowler,* it was the prosecutor who violated

---

3. That statute provides:
 (a) In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.

 (b) In civil and criminal proceedings, a husband or his wife is not competent to testify as to any confidential communications made by one to the other during the marriage.

the statute through his examination of the spouse without her knowing waiver of the right not to be compelled to testify against her husband, and here, too, the government's examination of Beepath–Hardy violated the statutory privilege protected by D.C.Code § 14–306. Thus, as in *Bowler*, the question is one of a statutory violation "as it impacted upon the fairness of appellant's trial." 480 A.2d at 685. Appellant is allowed to raise that challenge here, as in *Bowler*, and we are obliged to consider whether the trial court's mistaken refusal to tell Beepath–Hardy of her privilege impacted the fairness of Egbuka's trial.

■ We undertake that analysis under the harmless error framework in light of Egbuka's objection at trial to the failure to advise Beepath–Hardy of her privilege.[4] To find a trial court error harmless under the standard set out in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), this court must be able to state "with fair assurance, that any such presumed trial court error did not substantially influence the [judge's] determination." *Roundtree v. United States*, 581 A.2d 315, 328–29 (D.C.1990) (citing *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239).

■ Although we cannot be certain that Beepath–Hardy would have declined to testify had she been told of her privilege,[5] we have little hesitation in believing that Beepath–Hardy would have preferred not to testify at trial. From all that appears (again, we do not have this portion of the transcript), Beepath–Hardy suggested she had testified falsely before the grand jury and, fearing a prosecution for perjury based on conflicting testimony, refused to testify at trial until the government offered her use immunity. And, by the time of trial, Beepath–Hardy was married to Egbuka and about to deliver their child. Whatever may have happened between them on September 18, 1998, it is logical to infer that by the time of trial Beepath–Hardy wanted to put that incident behind them and protect her marriage and her ability to raise her child with Egbuka's support. Had the trial court explained to Beepath–Hardy that she was not required to testify, it is a fair assumption that she would not have done so. That, in turn, would have prohibited the government from impeaching her (non-existent) trial testimony with her grand jury testimony, given before she was married to Egbuka. That testimony would have been hearsay had the government sought to introduce it for a purpose other than im-

4. The government suggests that Egbuka's counsel may not have renewed his objection to Judge Walton's ruling after Judge Walton announced his reliance on the Intrafamily Offenses Act as the basis for his ruling, thus requiring us to review Egbuka's claim for plain error. Of course, the government is forced to concede in the same breath that we don't know what happened at trial because the discussion of the spousal privilege issue and Judge Walton's rulings thereon are contained in a portion of the transcript that remains unavailable. In these circumstances, we think it reasonable to treat Egbuka's counsel's objection to Judge Walton's first ruling as sufficient to preserve a continuing objection to his refusal to tell Beepath–Hardy of her privilege.

5. The government speculates that Beepath–Hardy might have been advised by her counsel that she had a privilege not to testify but chose not to assert her privilege so that she could attempt to exonerate Egbuka in her trial testimony. Absent the transcript, we are unwilling to indulge the government's speculation as the basis for an affirmance of Egbuka's convictions. We find our own speculation in text equally persuasive, if not more so, given Beepath–Hardy's apparent refusal to testify at trial until the government offered her use immunity. The point, of course, is that neither counsel nor we know what actually happened at trial.

peachment of Beepath–Hardy's trial testimony. *See* D.C.Code § 14–102; *see also* Fed. Evid. R. 801(c) and (d). And it is clear from the transcript of Judge Walton's verdict (which is contained in a portion of the transcript that is available for our review) that he relied heavily on her grand jury testimony in deciding to convict Egbuka of the charges against him ("I just don't believe what she told me during this trial and I believe what she said before the grand jury is what actually occurred."). Without doubt, the error in admitting Beepath–Hardy's trial and grand jury testimony had "substantial influence" on the outcome in this case.

Thus, without Beepath–Hardy's grand jury testimony, the government would have been left with only the testimony of the eyewitness, Jemma Raymond, to prove the charges against Egbuka. Here again, our review is hampered by the absence of critical portions of the transcript of Raymond's testimony, including her entire direct examination and portions of her cross-examination. Taking the Substitute Statement at face value, however, we cannot say that Raymond's testimony alone would have been sufficient to convict Egbuka of the charges against him. At a minimum, absent Beepath–Hardy's grand jury testimony, the "attempted threats" count would be vulnerable because, even as related in the Substitute Statement, Raymond was unable to hear anything that Egbuka may have said to Beepath–Hardy. And Egbuka took the stand in his own defense, recounting a non-threatening and non-confrontational (albeit emotionally charged) encounter between himself and Beepath–Hardy very different from the one Raymond thought she saw. In these circumstances, we cannot say that the government has met its burden of showing that the admission of Beepath–Hardy's trial testimony was harmless error.

## III. CONCLUSION

The length of time it has taken for Egbuka's challenge to his conviction to reach us on direct appeal is a disturbing case of "process breakdown" that should not happen in our system of criminal justice. It did, however, and we are left with the view that neither Egbuka's counsel nor we are able to give his appeal the full consideration it deserves. Moreover, that which we are able to review leaves us with a strong conviction that a fundamental mistake was made when the trial judge refused to advise Beepath–Hardy of her spousal privilege. Because of the record deficiencies, we will never know what would have happened had matters played out differently, but we think there is at least a reasonable possibility that the result would have been quite different for Egbuka. Accordingly, the judgment is hereby reversed and the case remanded for the government to decide whether it wishes to retry Egbuka.

*Reversed and remanded.*