Michael C. JOHNSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 89–CF–302, 91–CO–650.

District of Columbia Court of Appeals.

Argued June 22, 1992.
Decided Nov. 3, 1992.

Peter H. Meyers, Washington, D.C., appointed by this court, for appellant.

Michael F. Tubach, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and David Schertler, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, STEADMAN, Associate Judge, and BELSON, Senior Judge.

**1218**

ROGERS, Chief Judge:

Appellant Michael Johnson appeals his convictions of involuntary manslaughter and cruelty to a child, D.C.Code §§ 22–2405, –901 (1981), on five principal grounds.[1] He contends that the trial court (1) improperly allowed the government to introduce confidential communications between appellant and his common-law wife in violation of the spousal privilege in D.C.Code § 14–306(b) (1981); (2) erred by denying his motion to suppress his oral and written statements to the police; and (3) committed plain error in allowing the constructive amendment of the indictment. Appellant also contends that the trial judge erred by denying his motion pursuant to D.C.Code § 23–110 (1981) on the ground that he received ineffective assistance of trial counsel and by denying a full and fair hearing on the motion. We find no error in the admission of appellant's statements to his wife under D.C.Code § 14–306(b), nor in the admission of his statements to the police in the absence of advice of *Miranda*[2] rights. Because appellant's other contentions are unpersuasive, we affirm.

**I**

The charges in this case stemmed from the death of the eight-month old daughter of appellant and his common-law wife, Alecia Medley. On July 6, 1987, at approximately 7:30 p.m., Alecia Medley returned home from work and noticed that the baby had a bruise on her right temple. Ms. Medley testified that when she asked appellant about the bruise he told her that the baby had fallen off the bed. Ms. Medley left the apartment approximately thirty minutes later, and she did not return home until around 2:00 a.m. Appellant complained that the baby had been crying all night. Ms. Medley fed the baby and changed her diaper; she also noticed a scratch behind one of the baby's ears. When Ms. Medley asked appellant about the scratch, he again told her that the baby had fallen off the bed.

The baby began to cry again when Ms. Medley put her back into her crib. According to Ms. Medley, appellant told the baby to "shut her mouth," but the baby kept crying. Appellant then picked up a belt and took the baby into the bathroom. Ms. Medley testified that she heard "smacks" coming from the bathroom for approximately two to three minutes. Appellant then brought the baby out of the bathroom and returned her to her crib, warning Ms. Medley not to pick up the baby but to "let her holler." After appellant fell asleep, Ms. Medley gave the baby a bottle of water and then went to sleep.

At approximately 10:30 that morning, July 7, 1987, appellant and Ms. Medley realized that the baby was not breathing, and they took her to a nearby firehouse. A paramedic attempted to revive the baby at the firehouse; when these efforts failed, the child was transported by ambulance to Children's Hospital.[3] The paramedics transporting the baby noticed that she had "numerous bruises from head to toe on all parts of her body," and that her arms and legs were stiff.[4] Efforts to resuscitate the baby at the hospital also failed, and she was pronounced dead at 11:18 a.m.

The government offered into evidence expert medical evidence that the baby's death was due to a blunt force hitting her head, and could not have been caused by beat-

---

1. Appellant was indicted for second-degree murder while armed, D.C.Code §§ 22–2403, –3202, but he was convicted of the lesser-included offense of involuntary manslaughter.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Appellant and Ms. Medley were taken to the hospital in a separate ambulance. At that time, appellant told Saturnino Lopez, Jr., an emergency medical technician who was riding with the parents, that the baby had "fallen off the bed

between the bed and the wall" at about 6:00 p.m. the previous evening, and that when he picked up the baby she "had a bump around the left temple and a few scratches."

4. The paramedics found bruises on the baby's forehead and chin, on the side of her face, around one of her eyes, behind her ears, on the back of her neck, in her abdomen, chest and groin, in the spinal area, on both legs, including the inner and outer parts of the thighs and the backs of the legs, and on both buttocks.

ings with a belt.[5] The government also offered into evidence several statements by appellant, specifically, three oral statements to Ms. Medley, and oral and written statements to the police. In his statements to Ms. Medley, appellant indicated that he thought he would be arrested for causing the baby's injuries. In his statements to the police he admitted that he had taken the baby into the bathroom a second time at 5:00 a.m., and claimed that the baby had fallen twice as she tried to stand up in the bathroom, and that each time she had hit her head on the bathtub.[6]

## II

Appellant contends that the trial judge erred by allowing the government to introduce into evidence confidential communications between appellant and his common-law wife, Alecia Medley.[7] Although Ms. Medley testified regarding a number of statements allegedly made to her by appellant, appellant confines his objection in this appeal to three principal communications: (1) he told Ms. Medley before he beat the baby that she "better not pick [the baby] up" because appellant was raising the child in his own way, (2) he told Ms. Medley on the way to the hospital that "they might lock him up for this," and (3) he told Ms. Medley to go to defense counsel and give a statement so "that I wouldn't go to trial and that it would all be dropped and it would be over with."

## A

■ Assertions of marital testimonial privilege are governed by D.C.Code § 14–306, which provides:

(a) In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other.

(b) In civil and criminal proceedings, a husband or his wife is not competent to testify as to any confidential communications made by one to the other during the marriage.

This statutory marital privilege is applicable to common law marriages, which are recognized by the District of Columbia. *See Bowler v. United States*, 480 A.2d 678, 685 (D.C.1984). Because Ms. Medley testified voluntarily, subsection (a) does not apply. Thus, the issue is whether the trial judge properly admitted Ms. Medley's testimony regarding confidential communications made to her by appellant.

Before Ms. Medley testified, appellant objected to any testimony she might give that would fall within § 14–306(b). After hearing extensive argument on the issue, the judge ruled that the communications were admissible. In reaching this conclusion, the trial judge noted that there were explicit statutory exceptions making the § 14–306 privilege waiveable in child neglect proceedings,[8] in proceedings regarding intrafamily offenses,[9] and in adjudicato-

---

5. Dr. Rak Woon Kim, the medical examiner who performed the autopsy, testified that the baby most likely had died as a result of blows to the left side of her head, and that the other injuries on her body were "contributing factors."

6. Appellant called only one witness in his defense, Dr. Glenn Wagner, a forensic pathologist, whose testimony was directed toward the "while armed" charge in the indictment. Dr. Wagner generally agreed with the testimony of Dr. Rak Woon Kim, *see* note 5, *supra,* but opined that the injuries to the left side of the baby's head were the result of her head being "accelerated" against a flat object.

7. The government also does not dispute that the complained of communications from husband to wife are "confidential" within the meaning of § 14–306(b), and we will assume without deciding that they are.

8. *See* D.C.Code § 2–1355:

Notwithstanding the provisions of §§ 14–306 and 14–307, [the physician-patient privilege] neither the husband-wife privilege nor the physician-patient privilege shall be grounds for excluding evidence in any proceeding in the Family Division of the Superior Court of the District of Columbia concerning the welfare of a neglected child: Provided, that a judge of the Family Division of the Superior Court of the District of Columbia determines that such privilege should be waived in the interest of justice.

9. D.C.Code § 16–1005(b) provides:

Notwithstanding § 14–306, in a hearing under this section, one spouse shall be a competent and compellable witness against the other and may testify as to confidential communications, but testimony compelled over a claim

ry hearings to terminate the parent-child relationship.[10] Although no analogous statutory exception existed for criminal proceedings involving child abuse, the trial judge reasoned that:

> Frankly the issue in a neglect proceeding particularly when those issues concern abuse, physical abuse of a child cannot be any different than when they are in a criminal case and the statute explicitly sets aside the marital privilege in those particular cases.

In addition, the judge noted that other exceptions had been recognized by the Supreme Court so that "one spouse is permitted to testify in regard to communications of assault against him or her by the other spouse."[11] The judge concluded that § 14–306 did not bar testimony from Ms. Medley about confidential communications from appellant, stating:

> I am impressed with the proposition that when it comes to assault on a spouse in a marriage the Court has … decided that that matter is not barred by the marital privilege and therefore may come in … as a communication in spite of the marital privilege.
>
> I find very little if any difference between communications concerning an assault by one spouse on another and communications concerning an assault on a child of both the witness and the defendant in a criminal case particularly … when the age of the child is beneath oral communication. * * * I am persuaded … that the present state of the law in the District of Columbia is that the marital privilege does not apply to communi-

cations in regard to children of both the witness and the defendant particularly when those children are under the age of oral communication themselves.

## B

■ Appellant contends that the trial judge, in ruling that the marital privilege did not bar Ms. Medley's testimony about her confidential communications with appellant, "created a judicially-crafted exception to the spousal privilege in D.C.Code § 14–306(b)" that is unsupported by precedent. Appellant relies on the fact that the legislature has explicitly eliminated the marital privilege in only three instances. *See* D.C.Code § 2–1355 (proceedings involving neglected children), *supra* note 8, § 16–1005(b) (proceedings concerning intrafamily offenses), *supra,* note 9, and § 16–2359(e) (termination of parental rights of certain neglected children), *supra* note 10. Therefore, appellant argues, the statutory scheme encompassing spousal testimonial privileges "clearly show[s] the legislative intent to waive the spousal privilege in Family Division proceedings where the welfare of the child is the primary concern, but to retain the spousal privilege in other civil and criminal proceedings," especially in criminal trials, which emphasize protection of the rights of the accused. In essence, appellant views the legislature's retention of the marital privilege in civil and criminal proceedings outside of the Family Division as a conscious "judgment[ ] about the scope and extent of the marital privilege."[12] Consequently, he maintains that

---

of privilege conferred by such section shall be inadmissible in evidence in a criminal trial over the objection of a spouse entitled to claim that privilege.

**10.** D.C.Code § 16–2359(e) provides:

Notwithstanding the provisions of D.C.Code §§ 14–306 and 14–307, neither the husband-wife privilege nor the physician-client or mental health professional-client privilege shall be a ground for excluding evidence in any proceeding brought under this subchapter.

**11.** *See Wyatt v. United States,* 362 U.S. 525, 528, 80 S.Ct. 901, 903, 4 L.Ed.2d 931 (1960) (recognizing an exception based on "necessity" to the federal privilege for adverse spousal testimony

for cases in which one spouse commits a crime against the other; Mann Act prosecution); *see also Trammel v. United States,* 445 U.S. 40, 46 n. 7, 100 S.Ct. 906, 910 n. 7, 63 L.Ed.2d 186 (1980) (noting *Wyatt* exception and suggesting that the exception had been recently expanded to include crimes against children of either spouse, and that similar exceptions have been found to the confidential marital communications privilege) (citations omitted).

**12.** Appellant claims that "[w]hile there is no statutory exception to the spousal privilege in criminal cases involving young children or involving child abuse, the legislature was certainly aware of the need for spousal testimony in other types of judicial proceedings, and created

this court can uphold the trial judge's ruling admitting appellant's statements to his wife only if it finds that "the legislature acted in an unconstitutionally arbitrary or irrational manner in delineating the applicability of the marital privilege."

In response, the government maintains that the court has consistently looked to the common law in interpreting the scope of the marital privilege in § 14–306, and points to our decision in *Morgan v. United States*, 363 A.2d 999, 1004 (D.C.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977), in which the court relied on the necessity exception at common law to the confidential communications privilege for crimes committed by the husband against the wife. Further, the government maintains that when the Congress and the Council of the District of Columbia enacted the statutory provisions eliminating the marital privilege, they were "dealing with a discrete area of the law—civil protection orders, child neglect proceedings, and the termination of parental rights—and how the husband-wife privilege should intersect with that area." Thus, in the government's view, the legislature had no intention of precluding development of the common law governing the applicability of the marital privilege to criminal prosecutions when it enacted legislation waiving the marital privilege in Family Division proceedings.

Although the issue is not without difficulty, we conclude that the trial judge's interpretation of the proper scope of the confidential communications privilege under D.C.Code § 14–306(b) is consistent with the purpose of the marital privilege and the interpretations of it by this court, and not, as appellant argues, disruptive of the statutes of the District of Columbia. The marital privilege that existed in the common law was enacted into law by Congress when it codified the District of Columbia Code in 1901. *See Halback v. Hill*, 49 App.D.C. 127, 130, 261 F. 1007, 1010 (1919). Since then the court has continued to look to the common law to interpret the marital privilege under § 14–306. While the local

several explicit exceptions to the spousal privi-

legislatures (Congress and the Council of the District of Columbia) have spoken on the issue of the marital privilege from time to time, each time has involved a particularized, well-delineated subject area, and there is nothing in the legislative history of the three provisions which create exceptions to the marital privilege to suggest that such legislation was intended to address broader issues in the criminal law.

### C

█ The marital privilege in the common law

sprang from two canons of medieval jurisprudence: first, the rule that an accused was not permitted to testify in his own behalf because of his interest in the proceeding; second, the concept that husband and wife were one, and that since the woman had no recognized separate legal existence, the husband was that one. From those two now long-abandoned doctrines, it followed that what was inadmissible from the lips of the defendant-husband was also inadmissible from his wife.

*Trammel, supra* note 11, 445 U.S. at 44, 100 S.Ct. at 909. *See Halback v. Hill*, 49 App.D.C. 127, 130, 261 F. 1007, 1010 (1919). The law now recognizes both the accused's right to testify in his own behalf and the separate legal existence of the wife from the husband. *See, e.g.,* U.S. CONST., Amend. V; *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 2707, 97 L.Ed.2d 37 (1987); D.C.Code § 30–201 (1981) (married status does not impair woman's rights and responsibilities); *Chesser v. Troiano*, 61 A.2d 629, 631 (D.C.1948) ("relationship of husband and wife does not per se establish a principal and agent relationship"). Despite much criticism of the privilege it has survived, although over time exceptions to the privilege have been written into the law by the courts and the legislature. *See Trammel, supra* note 11, 445 U.S. at 44, 100 S.Ct. at 909. The modern rationale for the privilege is its "perceived role in fostering the harmony and sanctity of the mar-

lege in other non-criminal proceedings."

riage relationship." *Id.; see Morgan, supra*, 363 A.2d at 1004 n. 5.

This court has looked to the common law in interpreting the scope of the marital privilege in several contexts. The court has extended the privilege to apply to common law marriages. *Bowler, supra*, 480 A.2d at 685 ("we find no basis in law or reason to hold that the privilege does not so apply"). *Cf. Hawkins v. United States*, 358 U.S. 74, 79, 79 S.Ct. 136, 139, 3 L.Ed.2d 125 (1958) (observing that changes in rule barring testimony of one spouse against another "may eventually be dictated by 'reason and experience,'" (quoting Fed. R.Crim.Proc. 26, 18 U.S.C.A.)). In *Morgan, supra* 363 A.2d at 1004, the court looked to the common law exception for necessity in holding that a wife was competent to testify about statements her husband, the defendant, had made to her in private regarding his assault on her. *See also Lewis v. United States*, 140 U.S.App.D.C. 40, 44–45, 433 F.2d 1146, 1150–1151 (1970) (court looks to common law to determine whether defendant's acts were either "confidential" or "communica[tive]"); *United States v. Burks*, 152 U.S.App.D.C. 284, 289–290, 470 F.2d 432, 435–436 (1972) (court relies on common law to find privilege under § 14–306(a) inapplicable unless "the testimony of one spouse would favor or disfavor 'the other spouse's legal interests in the very case in which the testimony is offered.'") (quoting 8 J. WIGMORE, EVIDENCE § 2234 at 231 (McNaughten rev. 1961)). In addition, the court has determined, in the context of adverse spousal testimony, that the marital privilege belongs to the witness spouse, and may not be asserted by the spouse against whom the testimony is being offered. *See Bowler, supra*, 480 A.2d at 685; *Postom v. United States*, 116 U.S.App.D.C. 219, 220, 322 F.2d 432, 433 (1963); *see also Trammel, supra* note 11, 445 U.S. 40, 100 S.Ct. 906.

As the court acknowledged in *Morgan, supra*, 363 A.2d at 1004, the common law has long recognized an exception to the privilege in cases in which the husband was charged with committing wrongs directly on the person of the wife. *See Lord Audley's Case*, 123 Eng.Rep. 1140 (1631); 1

Blackstone Commentaries 443 (1765); *Stein v. Bowman*, 38 U.S. (13 Pet.) 209, 221, 10 L.Ed. 129 (1839); *see also* Wigmore, *supra* § 2239, at 242–247. Known as the "necessity" exception, *see Morgan, supra*, 363 A.2d at 1004, this rule was based on the recognition that if a wife could not testify against her husband, he would have a "vested license to injure her in secret with complete immunity." WIGMORE, *supra*, § 2239 at 242. Indeed, as Professor Wigmore points out, a necessity exception is also justified on the ground that the "very reason of the privilege [the promotion of marital peace] . . . is lacking." *Id.* In recent years other courts have recognized that the policies underlying the exception for crimes committed against the spouse apply with equal force when a spouse is charged with crimes committed against a child of either spouse. *See Adams v. State*, 563 S.W.2d 804, 809 (Tenn. Crim.App.1978) (holding that "marital communications" which arise from an act of violence by a spouse committed against the child[ren] of either spouse should constitute an exception to the marital privilege because such "communications" fail to satisfy the conditions underlying the creation of the privilege); *see also United States v. Allery*, 526 F.2d 1362, 1365–1366 (8th Cir. 1975) (extending common law exception for crimes committed against spouse to include crimes committed against child under Fed. R.Evid. 501); *cf. Trammel, supra* note 11, 445 U.S. at 46 n. 7, 100 S.Ct. at 910 n. 7 (noting exception for crimes against children of either spouse).

Although appellant contends that affirmance of the trial judge's interpretation of the scope of the marital privilege would "do violence" to the statutory scheme in the District of Columbia, we find the legislative purpose in enacting the statute as well as the legislative priorities that have followed to be significant. When Congress, in 1901, "enacted a rule of evidence for the District of Columbia that made husband and wife 'competent but not compellable to testify for or against each other,' except as to confidential communications," *Trammel, supra* note [11], 445 U.S.

at 48 n. 9, 100 S.Ct. at 912 n. 9, "[t]he purpose of Congress in enacting Section 14–306 was to remove, not increase, grounds of incompetency." *Morgan, supra,* 363 A.2d at 1004 (citing *Halback v. Hill, supra,* 49 App.D.C. at 130, 261 F. at 1010). While the courts have generally continued to recognize the importance of the marital privilege in protecting the private communications between spouses, *see, e.g., Bowler, supra,* 480 A.2d at 682; *Lewis, supra,* 140 U.S.App.D.C. at 44–45, 433 F.2d at 1150–1151, the local legislatures have determined, when focusing on areas in which important interests of the spouse and child have been at risk, that the welfare of a spouse and the welfare of the child of the parties or one of the parties shall take precedence over the interests protected by the marital privilege.

Thus, in 1970, Congress enacted new provisions establishing intrafamily offenses in the District of Columbia whereby one spouse could obtain a civil protection order against the other for conduct that would otherwise be deemed criminal. D.C.Code §§ 16–1001(5), –1003. Congress determined that in such a proceeding the marital privilege in § 14–306 would be unavailable as a bar to a spouse's testimony. *Id.* § 16–1005(b), *supra* note 9. It retained the privilege only as to compelled testimony, providing that such testimony "shall be inadmissible in evidence at a criminal trial over the objection of the spouse entitled to claim that privilege." *Id.*

Thereafter, the Council of the District of Columbia, in addressing the problems of child abuse and neglect, enacted two additional exceptions. D.C.Code § 16–2359(e) provides that, notwithstanding § 14–306, the marital privilege is unavailable in proceedings involving the termination of parental rights of neglected children. *See* note 10, *supra.* The legislative history indicates that the Council's focus was on assuring the prompt resolution of termination of parental rights proceedings. Proposed legislation originally included a speedy trial provision. *See* Bill No. 1–92, The Prevention of Child Abuse and Neglect Act of 1975, § 404. However, in response to an executive branch suggestion that the

speedy trial provision be deleted, because "a pending criminal trial against the parent . . . would preclude him or her from testifying in the neglect trial," the Council deleted the speedy trial provision, but retained a provision that testimony offered in abuse and neglect proceedings would be inadmissible in criminal proceedings. The Council thereby removed an obstacle to prompt abuse and neglect proceedings, *see* Report of the Council Committee on Human Resources and the Aging, D.C. Council (June 21, 1976) at 22; D.C.Law 2–22, § 410, codified as D.C.Code § 16–2359, and provided, without exception, that in proceedings involving the termination of parental rights the marital privilege would not apply. D.C.Code § 16–2359(e), *supra* note [10]. In order to achieve the principal aim of the termination statute—to "encourage stability in the lives of certain children," *id.* § 16–2351(a)(1)—the legislature determined that the marital privilege would not stand as a bar in the proceedings.

In a second area where the Council has acted, it has similarly deemed the welfare of the child to take precedence over the marital privilege. Thus, where the welfare of the neglected child is at issue, the Council enacted legislation which provides that the marital privilege would not be "grounds for excluding evidence . . . in the Family Division . . . concerning the welfare of a neglected child" where a judge determined that the privilege should be waived "in the interests of justice." D.C.Code § 2–1355, *supra* note 8. This provision appears as part of legislation that requires medical personnel and others, subject to criminal prosecution, to report suspected instances of child neglect. The purposes are to identify the children and to protect them, as well as "to preserve the family life of the parents and children, to the maximum extent possible, by enhancing parental capability for adequate child care." D.C.Code §§ 2–1351, –1352, –1357.

Thus, although the legislative history of the marital privilege and its statutory exceptions is sparse, appellant's suggestion that the legislature, having focused on the importance of proceeding promptly in mat-

ters involving abused or neglected children, also affirmatively intended that the confidential communications privilege would remain an obstacle when the child was killed by a parent (and hence there was no longer a possibility of abuse or neglect proceedings) is not well founded. Congress focused on removing incompetency, both in 1901 and in 1970. The Council's focus was on facilitating abuse and neglect proceedings, and not on the marital privilege in criminal prosecutions involving offenses against one family member by another. Although there are distinctions between the civil context of proceedings to determine whether a child has been abused or neglected and the criminal context at issue in the instant case, the public policies are complementary. In the former there is an interest in preserving "the family life of the parents and children ... by enhancing parental capability for adequate child care." D.C.Code § 2–1351. But, the public interest in protecting children is served by prosecuting a father who kills his child. The "chilling effect" on marital communications would arguably be greater if the potential cost of communicating to a spouse is the deprivation of one's liberty as opposed to deprivation of one's right to raise a child. Thus, interpreting § 14–306(b) to incorporate the necessity doctrine where the witness-spouse's child has been killed by the defendant-spouse is consistent with the policy of preventing circumstances which would facilitate immunity for acts of child abuse and neglect.

Consequently, after examining common law precedents regarding the proper scope of the marital privilege and in view of the legislative judgment about exceptions to the privilege, we conclude that the exception to the confidential communications privilege is applicable in the instant case.[13] Although the legislatures in a number of jurisdictions have addressed the issue presented in this appeal by statute,[14] the origin of the doctrine of marital privilege is in the common law, and the caselaw makes clear that the common law remains a source for this court to use in interpreting § 14–306. The fact that the District's legislatures have addressed the privilege in three instances does not mean, as appellant maintains, that despite changes in the legal status of married women and expanded legislative concern about the mistreatment of children by their parents, the legislatures have eliminated the common law exceptions that exist to the privilege. Rather, we conclude that the legislatures have simply never addressed the issue presented in this appeal.

■ Therefore, because the court has recognized the necessity exception to the marital privilege in § 14–306, *see Morgan, supra,* 363 A.2d at 1004, it necessarily follows, in our view, that the exception to the confidential communications privilege is properly "expanded to include crimes done to a child of either spouse." *Cf. Allery, supra,* 526 F.2d at 1367 (under FED.R.EVID. 501). *See also Adams, supra,* 563 S.W.2d at 809 ("the wrong to the child is equally a wrong to the observing spouse"). While the marital confidential communications privilege is almost sacrosanct, *see Trammel, supra* note 11, 445 U.S. at 51, 100 S.Ct. at 912; *Blau v. United States,* 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951), it would be illogical for the court to conclude that the privilege is not a bar when the husband inflicts an injury on the wife, *see Morgan, supra,* 363 A.2d at 1004, but is a bar when the husband kills the parties' child. We agree with the trial judge's observation that it would be an "artificial distinction" to apply the privilege "in assault cases against children [of either

---

**13.** Although the court stated in *Croom v. United States,* 546 A.2d 1006, 1009 n. 4, (D.C.1988) (dictum), that the question of whether the statutory spousal privilege should be extended to crimes against children of the witness spouse "is a question for the legislature," unlike *Croom,* the question of the applicability of the privilege to crimes against children of the witness spouse is squarely presented here.

**14.** *See e.g.,* Cal.Evid.Code § 985(a) (West); Del.Uniform Rules of Evid. 504(d)(2); Fla.Stat. Ann. § 90.504(3)(b) (West 1979); Hawaii Rules of Evid. 505(c)(1)(B); Ill.Rev.Stat. Ch. 38, para. 155–1; Tex.Rules of Crim.Evid. 504(1)(d)(2).

spouse] even though the law has established that it does not apply in the case of assault against the spouse."

The rationale for the necessity exception was that it would give one spouse a "vested license to injure [the other spouse] in secret with complete immunity." WIGMORE, *supra*, § 2239 at 242. That rationale is equally applicable when the victim is an eight-month-old child. Since the victim cannot speak for herself, it is primarily the victim's parents who must assume the role of testifying on her behalf. In the same way that the necessity exception prevents the marital privilege from silencing the victimized spouse, it should also prevent the privilege from silencing the only person who can, as a practical matter, communicate on behalf of the victimized child. Any other rule would have the unjust effect of making it easier for a parent to escape criminal prosecution for harming his own child than for harming the child of another. To the extent that parents are the most probable witnesses to any crime against young children, the criminal who kills his own child would have a greater measure of immunity because he could silence the only probable witness through the marital communications privilege. Thus, an exception to the marital privilege is particularly necessary to prevent parents from using the privilege as a license to harm their own children, and particularly those children who cannot speak for themselves. Even though it is possible that marital harmony could be restored after a husband has directly injured a wife, *see Hawkins, supra*, 358 U.S. at 77–78, 79 S.Ct. at 138–39 (noting widespread success in conciliating family differences), the necessity exception nevertheless waives the privilege. A similar result should follow where one spouse has killed the parties' child. *Cf. Trammel, supra* 445 U.S. at 53, 100 S.Ct. at 913 ("[w]hen one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace"); *Wolfle v. United States*, 291 U.S. 7, 17, 54 S.Ct. 279, 281, 78 L.Ed. 617 (1934) ("privilege suppresses relevant testimony and should be allowed only when it is plain that marital confidence cannot otherwise reasonably be preserved").

Here, appellant's common-law wife testified voluntarily as the only witness to the events leading up to the death of her daughter. Although the government's evidence included Ms. Medley's written statement inculpating appellant, and appellant's statement regarding the circumstances of the baby's death, only Ms. Medley could testify that appellant had told her on the way to the hospital that he expected to be arrested for causing the baby's death, and that appellant asked her to give a statement to defense counsel which would get the charges against him dropped. We hold, therefore, that because Ms. Medley was the only witness to an assault against the parties' child, who could not speak for herself, the trial judge did not err in admitting into evidence Ms. Medley's testimony about confidential communications to her by appellant.

### III

Appellant also contends that the trial judge erred by denying his motion to suppress the highly damaging statements that he gave to Detective McGinnis at the police station in violation of his Fourth and Fifth Amendment rights. As appellant states, the principal issue is whether appellant was in custody at the time he made the statements in response to police questioning without having first been advised of his *Miranda* rights. Appellant also views as closely related the issue of whether he voluntarily went to the police station and remained there for over five hours. Upon a review of the record, *see United States v. Gayden*, 492 A.2d 868, 872 (D.C.1985), we find no error by the trial court.

### A

We begin with the proposition that:

not all personal intercourse between policemen [and policewomen] and citizens

involves "seizures" of persons. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Nor does "[a] mere 'focussing' of an investigation upon a suspect ... entail the kind of coercion that triggers the *Miranda* requirements." *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). Rather, "[w]hat is determinative of custody is that the police have by word or conduct manifested to the suspect that he is not free to leave." *Calaway v. United States,* 408 A.2d 1220, 1224 (D.C.1979). In *Ruffin v. United States,* 524 A.2d 685, 699 (D.C.1987), in concluding that the defendant was in custody when he gave his written statement to the police, the court considered a number of factors, including "the period of time which had elapsed, the virtually continuous interrogation, the inherently coercive atmosphere [of the police interrogation room], the eliciting of a signed waiver of *Miranda* rights despite Ruffin's announced concern that he might need a lawyer, and the lack of any indication to Ruffin that he was entitled to leave the stationhouse whenever he wished." 524 A.2d at 669–70. Likewise, in *Gayden, supra,* 492 A.2d at 874, the court concluded that, despite repeated advice that he could leave at any time, the defendant could reasonably conclude that he needed police permission to leave as a result of a combination of factors, including the length of time that he spent in the police department (over five hours) giving rise to a growing sense of isolation from family and friends, the layout of the interrogation room, the constant company of armed police, and the skepticism of the police about the defendant's first statement, as re-flected in accusatory questions about his guilt, followed, after his second statement, by police use of the "fresh face" technique to obtain an admission of guilt. A similar analysis is appropriate here.

Briefly summarized, the evidence showed that after the baby was pronounced dead, Detective Patrick McGinnis of the Homicide Division informed appellant "that it was necessary for [the police] to speak to him," because the police conducted investigations for the Medical Examiner's office in all deaths. Detective McGinnis requested and obtained appellant's consent to search the apartment appellant shared with Ms. Medley.[15] Thereafter, Detective McGinnis and Detective Evans searched the apartment and recovered two belts that were lying on top of a dresser.[16] While the police were searching the apartment, appellant and Ms. Medley were transported in separate vehicles to the police station.

Detectives McGinnis and Evans returned to the Homicide Division office between 2:00 p.m. and 2:30 p.m., and Detective Evans went to talk to Ms. Medley while Detective McGinnis questioned appellant. Detective McGinnis found appellant sitting alone in an interview room in the police station. According to Detective McGinnis, when he arrived there were no police officers around appellant, either in the interview room or stationed outside the door to prevent appellant from leaving, and appellant was not handcuffed.[17] Detective McGinnis testified that he sat down with appellant and explained that he was responsible for gathering information for the Medical Examiner's office, and that appellant was not under arrest. Detective McGinnis then began to question appellant about the events leading up to the baby's death, but did not advise appellant of his *Miranda* rights. During the interview, McGinnis left appellant alone in the room three or four times while McGinnis went to

---

**15.** Ms. Medley's consent to search was also obtained by Detective McGinnis and his partner, Detective Anne Evans.

**16.** Bruises on the baby's body were later determined to match the buckle on both belts.

**17.** Appellant testified at the hearing on his motion to suppress that a "middle-aged guy" sat outside the interview room until McGinnis arrived.

buy some food for lunch, went to the bathroom, conferred on three occasions with other police officers, and purchased cigarettes for appellant.[18]

At approximately 4:00 p.m., Detective McGinnis began to take a formal written statement from appellant. The statement was in the form of a series of questions asked by Detective McGinnis and appellant's answers to those questions. The first question and answer read:

Q: Mr. Johnson, do you understand that you are not under arrest and it's the policy of the D.C. Police Department to act as investigator for the D.C. Medical Examiner's Office in cases of all deaths which take place within the District of Columbia.

A: Yes, I understand.

According to Detective McGinnis, appellant appeared willing to cooperate and never requested an attorney. During the course of his interview with appellant, Detective McGinnis left the room briefly, and at one point was informed by another officer that the Medical Examiner had found that the buckles on the belts found in appellant's apartment matched an injury on the baby's face. After he finished taking appellant's statement at 6:20 p.m., Detective McGinnis entered the room where Detective Evans was taking Ms. Medley's statement and learned that Ms. Medley had told Detective Evans that appellant had beaten the baby in the bathroom the previous evening. At that time, Detective McGinnis decided that he had probable cause to believe that appellant had killed the baby, and arrested him.

In denying the motion to suppress, the trial judge acknowledged that neither side had a "frivolous position," and that "it's a very difficult motion to resolve, particularly when you get to the signed written statement of the defendant." Viewing both the government and defense testimony, and eschewing the need for a credibility determination, the judge found that appel-

lant and Ms. Medley had voluntarily gone to the hospital and were not in police custody while there. Regarding appellant's written statement, the judge viewed as "[s]ignificant" the fact that the statement began with appellant's acknowledgement that he understood that he was not under arrest. The judge further found that there was no physical restraint of appellant at any time.[19] [id] The judge rejected the notion that appellant was psychologically and mentally restrained. Specifically, the judge observed that:

while on the one hand there is this long period of time that both Ms. Medley and the defendant are at the Homicide Office, ... there are any number of occasions on which the police officers are telling the defendant that they are—are the arm of the medical examiner's office and as the arm of the medical examiner's office they need as much information as they possibly can get on the death of his daughter; and that his position ... in response ... is, well, they're police officers, these people who are telling me this, and being police officers, I will accept what they are saying and do it. At no time does he offer any resistance or indicate—he didn't indicate that he doesn't want to do any of these things.

Regarding the state of mind of the police, the judge deemed it important that all of the police officers had testified that if appellant had decided to leave and had done so, the officers would not have been pleased, but they would have been powerless to stop him.

Concluding that appellant was not in custody when he made statements to the police, the trial judge found that there was never any force, deception, or other than polite treatment by the police of appellant. Further, the judge found that although appellant's interaction with the police took place over a long period of time, during

---

18. During one of Detective McGinnis' absences, appellant spoke briefly with Ms. Medley, whom he saw in the hall outside the interview room.

19. Regarding appellant's transport in a police vehicle from the hospital to the police station, the judge noted that because appellant had trav-

eled to the hospital in an ambulance, he did not have transportation to the police station. Thus, the judge noted that the circumstances in *Ruffin, supra,* 524 A.2d at 699, were readily distinguishable.

that time "there was every indication that if the defendant wanted something ... he either would have been permitted to get it himself or it would have been gotten for him." Even viewing the issues from the perspective of appellant's testimony about what had happened, the judge stated that he would still have concluded that appellant voluntarily went to the police station and made the statement.

### B

On appeal, appellant maintains that there are five circumstances that, taken together, indicate that he was in police custody when he made his statements at the police station.

 First, he maintains that he was kept under police observation at the hospital, told he could not speak to Ms. Medley, and told by Detective McGinnis that he would have to come down to the precinct to answer questions about the child's death. While the record shows that there were police officers at the hospital, and that appellant and Ms. Medley were in separate areas of the hospital shortly after they arrived, there is nothing in the record to suggest that appellant was in the custody of the police. As the government points out, appellant came to the hospital voluntarily, and he remained there in order to learn whether efforts to resuscitate the baby would succeed. While at the hospital, appellant had only minimal contacts with the police officers.[20] Appellant testified, moreover, that Detective McGinnis had only told him that he "needed" appellant to come to the police station to give a statement concerning the baby's death. The detective's statement is, thus, distinguishable from that in *United States v. Allen*, 436 A.2d 1303, 1305 (D.C.1981), on which appellant relies, where the police told the defendant that he would "have to come" to the police station. Appellant admitted that he was never threatened with arrest or handcuffed, that the police "didn't say anything" to make him feel that he was in custody, and that he never indicated he did not want to give Detective McGinnis information in connection with the police investigation of the baby's death. Several government witnesses indicated that separating witnesses was a standard procedure. Accordingly, we find no support in the record for appellant's contention that he was "in custody" while at the Hospital.

 Second, appellant relies on the evidence that he was taken to the precinct in a caged police car and that a "middle-aged guy" stood watch outside a small interview room until McGinnis arrived about one and one-half hours later.[21] Our decision in *Calaway, supra*, 408 A.2d 1220, is dispositive of appellant's contention that the manner in which he was transported to the police station necessarily meant that he was "in custody." In *Calaway*, the police informed Calaway that he was not under arrest but that they wanted to question him at their office about a crime, and offered him a ride to and from the police station. This court held that "[w]hile the use of a police car to transport a suspect to the stationhouse might in other circumstances add to the coercive aspects of the questioning, it did not do so here." *Id.* at 1225. We find no basis to question the trial judge's finding that appellant's transportation in a scout car "cannot amount to a detention." *See* note 19, *supra*.

Further, unlike the situation in *Ruffin, supra*, 524 A.2d at 699, there is no evidence in the record before us to suggest that appellant was physically confined in the witness room. He was not handcuffed nor

---

**20.** Before Detective McGinnis spoke to appellant regarding permission to enter the apartment and coming to the police department to answer questions, appellant told the officers only his name, date of birth, address, and a brief description indicating that the baby had fallen on her head the previous day.

**21.** Ms. Medley was transported in an unmarked police cruiser. Appellant was transported in a marked police scout car. Detective John Powers, who drove Ms. Medley to the police station, testified that "it's always a good idea to keep witnesses to a crime separate. It's sort of customary procedure." Detective McGinnis testified that appellant was driven to the police station in a marked car because "[i]t was what was available."

even frisked.[22] Although appellant was never told that he could leave, neither was he told that he could not leave. Detective McGinnis testified that when he arrived at the homicide office, appellant was sitting alone. According to appellant, the man he claimed sat outside the door never said anything to him. In addition, none of the police officers involved in the case ever brandished a weapon.

■ Third, to show that he was in police custody, appellant relies on the police seizure of two belts from appellant's apartment and the police questioning of appellant's neighbors about prior assaultive conduct by appellant toward Ms. Medley, the baby, and his older son. Although appellant does not claim that his consent to search was given involuntarily, he appears to suggest that once the police had discovered the belts and had spoken to the neighbors, the police had probable cause to arrest him and, therefore, he was entitled to be advised of his *Miranda* rights. In his motion to suppress, appellant argued that "[e]ven if a suspect is not formally under arrest, the existence of probable cause to arrest at the time of interrogation will support a finding of custody 'to the extent that it makes it more likely that investigator will 'bear down in interrogation and ... create the kind of atmosphere of significant restraint that triggers *Miranda* ...,' *Calaway v. United States*, 408 A.2d 1220, 1225 (D.C.1979) (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir.1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970)). *See Miley* [*v. U.S.*]

477 A.2d [720] at 722 [ (D.C.1984) ]." However, in *Calaway, supra*, 408 A.2d at 1225, the court made clear that the existence of probable cause "is a circumstance to be considered ... but it is not controlling on the question." [23] *Miley, supra*, 477 A.2d at 722–23, is readily distinguishable on its facts. Detective McGinnis testified that he did not think he had probable cause to arrest appellant until he learned that Ms. Medley had implicated appellant in her statement to Detective Evans, which occurred after Detective McGinnis had completed taking appellant's statement and appellant had been reviewing it. *See Beckwith, supra*, 425 U.S. at 347, 96 S.Ct. at 1616. The medical evidence, moreover, indicated that the belt beating did not cause the baby's death. Even if we were to accept appellant's assertion that the search of his apartment and questioning of the neighbors gave the police probable cause to believe that he had killed his daughter, there is nothing in the record, other than the passage of time, to show that the police were engaged in "some affirmative action other than 'polite interrogation.' " *Hall, supra*, 421 F.2d at 544.

■ Fourth, appellant contends that the length of time that he was questioned— four and one-half hours—in the interview room by Detective McGinnis, who knew the medical examiner had determined the baby's death to be a homicide and who wore his gun at the time of the interview, shows that appellant was in custody. The trial judge's findings on the nature of what

---

**22.** In *Ruffin, supra*, 524 A.2d 685, 699, the court held that Ruffin was not in custody when he gave an oral statement to police almost immediately after having been driven to the police station in a marked police car, told that he was not under arrest and advised of his *Miranda* rights. However, the court held that Ruffin was in custody at the time he gave a written statement, approximately one and a half hours later, to the police after having been given the *Miranda* warnings a second time and having asked the detective who was questioning him whether the detective thought Ruffin needed a lawyer. No one ever advised Ruffin that he was free to leave, and there was conflicting testimony as to whether Ruffin was handcuffed to the desk during his interview with the police.

**23.** In *Hall, supra*, 421 F.2d 540, cited in *Calaway, supra*, 408 A.2d at 1225, the Second Circuit Court of Appeals stated that in *Miranda*, the Supreme Court intended "that something more than official interrogation must be shown. It is hard to suppose that suspicion alone was thought to constitute that something; almost all official interrogation of persons who later become criminal defendants stems from that very source." 421 F.2d at 544. The court further suggested that "in the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Id.* at 545.

happened during that time are supported by the record and are not clearly erroneous. The circumstances—that the police knew that the baby's death had been ruled a homicide and that the detective was armed—do not show custody here.[24] There was no evidence that McGinnis stalled in order to gather information that would provide probable cause to arrest appellant. *Cf. Gayden, supra,* 492 A.2d at 871. Nor was there evidence that McGinnis adverted to the fact that he was armed. *See* Metropolitan Police Department General Order Series 1101, No. 1 § 9(a) (February 24, 1991) (members on duty shall carry their issued service pistol). In addition, appellant was left alone at times, when McGinnis left the interview on "at least three or four" occasions, and he spoke to Ms. Medley while at the police station, albeit only briefly. Further, appellant testified that when he had said that he wanted to get some money from Ms. Medley for food or cigarettes, Detective McGinnis had simply said that he could not speak with her "at that time"; in fact, apparently unknown to McGinnis, appellant spoke briefly with Ms. Medley when she appeared in the doorway of the room where he was being interviewed. McGinnis also left and returned with cigarettes for appellant. Absent any evidence that appellant was under physical restraint, *see Ruffin, supra,* 524 A.2d at 699 (Ruffin claimed he was handcuffed to a desk, and the detective said he could not recall, although it was possible in view of police policy to handcuff suspects), or that he was being subjected to increasingly aggressive interrogation by teams of officers, *see Gayden, supra,* 492 A.2d at 874, or that he in any manner requested that the

questioning stop, or indicated that he wanted to leave or objected in any way to being in the police station and speaking with Detective McGinnis, the length of time alone is insufficient to show custody here.

Nevertheless, the length of time is troubling. Four hours is a long time. Appellant had been emotionally distraught about the baby. He was denied the opportunity on two occasions, once at the hospital and later at the homicide office, to speak with his wife. The police had gathered considerable evidence indicating appellant's culpability before he completed his statement. It is not inconceivable that the passage of time may alone be evidence that a person is in custody. But this is not such a case. Although four hours is a long time to be questioned, or wait to be questioned, by the police, the trial judge's observation about how long it takes government to work, with all the paperwork, is not without significance. While investigative time and bureaucratic requirements cannot excuse delay, and nothing suggests that the judge so implied, the government offered evidence to show that during the four hour period appellant was not constantly subjected to police questioning, but he was left alone on several occasions. In addition, appellant was never threatened. Detective McGinnis remained soft-spoken and polite, although firm, while speaking with appellant. These facts were undisputed by appellant. There is no evidence here that appellant was worn down, or was psychologically pressured by the police. In this regard the trial judge's observation, quoted above, is once again persuasive.

 Fifth, appellant relies on his testimony that, although he was told for the

---

**24.** Detective McGinnis testified that at his initial encounter, when appellant was sitting in the Sex Offenders Division office, that he reinformed appellant "as a matter of formality" that he was not under arrest and of the purpose of the interview. He conferred with appellant for about an hour and one half before beginning to type the statement. He also explained that he was not in continuous conversation with appellant because he left the room on several occasions to buy lunch, to go the bathroom, and to confer on separate occasions with Detective Hickman (who told him the belts had been forwarded to the medical examiner's office and

that an autopsy was in progress or soon to be in progress) and with Detective Evans on two separate occasions which were at least an hour apart (the second conversation occurred after appellant had finished giving his statement; it was at that time that Detective McGinnis first learned that Ms. Medley had claimed that appellant had beaten the baby). Detective McGinnis began taking appellant's statement before he went to see Detective Evans, who was interviewing Ms. Medley. He did not inform appellant before he was arrested that the medical examiner had ruled the baby's death was a homicide.

second time as he began to prepare his written statement, three and one-half hours after he arrived at the precinct, that he was not under arrest, he felt as a result of police actions and statements to him that he was not free to leave either the hospital or the precinct. Appellant has not pointed, however, to the type of affirmative action by the police required to show custody. At best he has claimed that he was not free to go because there were always police in the vicinity and he did not really choose to speak with the police. Appellant admitted that he thought the police were at the hospital for another reason, and never suggested that the presence of police officers at the homicide office was sufficient to show that he was not free to leave. At no point did appellant testify that his response to Detective McGinnis—that he understood that he was not under arrest—was false at the time he made it. Nor has appellant contested the trial judge's findings that although appellant was upset about the death of the baby he knew what was going on around him and he understood what was being said to him. Neither did appellant claim that he was ever questioned in an accusatory manner which suggested his guilt. Again, we find the trial judge's interpretation persuasive.

Viewing the five circumstances together, we find no occasion to conclude that the trial judge erred by denying appellant's motion to suppress his statements on the ground that his Fourth and Fifth Amendment rights were violated. We are persuaded by the factual reasons given by the trial judge, which are supported by the record and are not clearly erroneous, *see Gayden, supra,* 492 A.2d at 872; *(Ernest) Giles v. United States,* 400 A.2d 1051, 1054 (D.C.1979), for concluding that appellant had not been seized before he gave the signed statement to Detective McGinnis. These include the facts that appellant was told that he was not under arrest and acknowledged that he understood that he was not; he had earlier indicated his willingness to provide information to the police and never advised anyone that he had changed his mind; no officer physically detained him; he was left alone for several periods

during the investigation; and the police never made any show of force and testified that if appellant had decided to leave he would not have been stopped. Unlike *Ruffin, supra,* 524 A.2d at 699, appellant never gave any hint that he had ceased to be willing to cooperate with the investigation or viewed the questioning as accusatory. In contrast to *Gayden, supra,* 492 A.2d at 873, there is no evidence that the police used a psychological ploy to obtain a confession. Appellant simply stayed at the police station for a long time. His testimony that he felt he was not free to leave because there were always police around is insufficient under the circumstances to overcome the government's evidence, in meeting its burden, *see Ruffin, supra,* 524 A.2d at 691 n. 4, that appellant was not in custody at the time he made his statements to Detective McGinnis, particularly in view of appellant's admission that he knew when he responded to Detective McGinnis' questions that he was not under arrest. Accordingly, the trial judge did not err by denying appellant's motion to suppress his statements to the police.

## IV

■ Count four of the indictment charged that appellant,

> while armed with a dangerous weapon, that is, a belt, and with malice aforethought, killed [the baby] by beating her with a blunt object and with a belt between on or about July 6, 1987, and on or about July 7, 1987, thereby causing the injuries from which [the baby] died on or about July 7, 1987.

Appellant contends that there was a constructive amendment of the indictment because the indictment charged appellant with second degree murder while armed with a belt, while the proof at trial showed that the fatal wounds were inflicted with a "blunt object," not with a belt.

According to appellant, the prosecutor consistently argued at trial that appellant made one trip into the bathroom during which he beat the baby to death until the defense called its one witness, a forensic pathologist, and renewed its motion for

judgment of acquittal. At that time, the prosecutor successfully moved to dismiss the "while armed" part of the charge, conceding that the baby was not killed when appellant beat her with a belt, and argued that the baby was instead killed several hours later, during a second trip to the bathroom, when appellant "slap[ped] the baby around, or he knock[ed] its head against either the wall, or the bathtub, or the bathtub floor, and he silence[d] her for good." Appellant further argues that the constructive amendment of the indictment was compounded when the trial judge, in final instructions to the jury, stated that the second-degree murder charge and the lesser-included involuntary manslaughter charge related only to the second trip appellant made to the bathroom with the baby, when he did not have the belt.

In response, the government maintains that its theory of the case "from the beginning" was that appellant had not inflicted the fatal wounds with the belt, but he could nevertheless be charged with murder while armed because he had used the belt in the process of beating the baby to death. The government concedes that the prosecutor abandoned that theory when he moved to dismiss the "while armed" portion of the murder charge, but it insists that this "limiting of the indictment in no way altered the manner in which appellant was charged with killing his daughter."

The Grand Jury Clause of the Fifth Amendment provides that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." In determining whether an indictment has been constructively amended, the court "compares the evidence and the judge's instructions to the jury with the charge specified in the indictment." *Ingram v. United States*, 592 A.2d 992, 1005 (D.C.), *cert. denied*, — U.S. —, 112 S.Ct. 667,

116 L.Ed.2d 757 (1991) (citing *Scutchings v. United States*, 509 A.2d 634, 638 (D.C. 1986)). In general, a constructive amendment occurs when the trial court permits the jury to consider, under the indictment, "an element of the charge that differs from the specific words of the indictment." *Id.* at 1005; *see Stirone v. United States*, 361 U.S. 212, 217–218, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960) (indictment limited to extortion by interference with interstate transportation of sand expanded by constructive amendment to include interference with sand and steel). A conviction will be reversed only if the evidence introduced at trial and the judge's instructions to the jury "raise the 'substantial likelihood' that appellant may have been convicted of a crime different from that charged by the grand jury." *Barker v. United States*, 373 A.2d 1215, 1219 (D.C.1977); *see also Scutchings, supra*, 509 A.2d at 638. Appellant concedes that he failed to raise the issue of constructive amendment of the indictment at trial, thus, our review is for plain error.[25] *See Watts v. United States*, 362 A.2d 706 (D.C.1976) (en banc) (plain error exists only in exceptional circumstances, where the "errors complained of [are] so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial"); *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982) (error must be so plain that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it").

The indictment charged appellant with killing the baby "by beating her with a blunt object and with a belt between on or about July 6, 1987 and on or about July 7, 1987." The prosecution introduced evidence showing that appellant made two trips to the bathroom with his daughter on the night she was killed—the first at approximately 2:00 a.m. and the second at

---

**25.** Appellant's counsel did, in fact, object to the prosecutor's closing argument, and also renewed her motion for judgment of acquittal. Trial counsel's objection, however, was on the ground that there was insufficient evidence to support the prosecutor's theory of the case, rather than that the prosecutor had constructively amended the indictment. The trial judge denied the motion. Because the objection at trial rested on different grounds than those raised on appeal, our review is for plain error. *See Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (en banc).

approximately 5:00 a.m.[26] Nowhere does the indictment specify at exactly what time, or on which of his two trips to the bathroom, appellant administered the fatal beating. Thus, the prosecutor's decision to shift his emphasis from the 2:00 a.m. trip to the bathroom during which appellant administered a beating with a belt, to the 5:00 a.m. trip during which the baby was beaten with, or against, a blunt object, did not constitute proof of "facts different from the facts that would support the offense charged in the indictment." *Scutchings, supra,* 509 A.2d at 637 (quoting *(Willie) Giles v. United States,* 472 A.2d 881, 883 (D.C.1984)).[27]

The trial judge's final instructions to the jury, in which he emphasized that the jury could convict appellant only if it found "first, that there was a second trip to the bathroom; and, second, that killed [the baby] at that time," were also consistent with the language of the indictment. Accordingly, we hold that the indictment was not constructively amended, and that the trial judge committed no error, much less plain error, in permitting the prosecutor to dismiss the "while armed" portion of the murder charge and to proceed on a theory that the baby was killed during the 5:00 a.m. trip to the bathroom.

## V

Appellant next contends that the trial judge erred by denying his motion pursuant to D.C.Code § 23–110 because he was denied the effective assistance of trial counsel for two principal reasons.[28] First, appellant maintains that trial counsel failed to object to the constructive amendment of the indictment or to the trial judge's final jury instructions relating to the amendment of the indictment.[29] Because the indictment was not constructively amended, *see* Part IV, *supra,* this contention is meritless. Second, appellant maintains that "trial counsel failed to properly investigate the case to obtain evidence from Children's Hospital [that] would have been critical to both the motion to suppress and the trial." He focuses on trial counsel's "fail[ure] to subpoena all the pertinent medical records from Children's Hospital and to seek to

---

26. Ms. Medley testified that appellant "picked up the belt and picked up the baby and went in the bathroom and closed the door" and that she then heard "smacks." Although appellant did not testify, the statement he gave to Detective McGinnis at the police station was read both to the Grand Jury and at appellant's trial. In the statement, appellant said that at "about 4:45 or 5:00 a.m. ... [the baby] had woke me up. And since I didn't want her to wake her mother, I took her to the bathroom with me. She tried to stand up twice while in the bathroom with me and both time[s] she fell down and hit her head."

27. Appellant contends that the prosecutor's closing argument constituted a "total[ ] change[ ]" in theory from that in his opening statement. Even if true, the court has stated, albeit in the context of an alleged variance rather than a constructive amendment, that "because the arguments of counsel are not evidence and the jury was so instructed, these arguments themselves cannot amount to a variance." *Ingram, supra,* 592 A.2d at 1007–1008. Here, the jury was likewise instructed that the arguments of counsel are not evidence.

28. It is well settled that in order to demonstrate that his trial counsel's assistance was constitutionally ineffective, appellant must show (1) that counsel's performance was deficient; and

(2) that the deficient performance prejudiced the defense, *i.e.,* that there is a "reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Trial counsel have "a duty to make reasonable investigation of the case," *id.* at 688, and failure to obtain key testimony or evidence in preparation for trial may constitute ineffective assistance of counsel. *See Harris v. United States,* 441 A.2d 268 (D.C.1982); *Asbell v. United States,* 436 A.2d 804 (D.C.1981). However, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington, supra,* 466 U.S. at 689, 104 S.Ct. at 2065.

29. As previously noted, *see* note 26 *supra,* appellant's trial counsel did object to the prosecutor's closing argument on the ground that the evidence presented was insufficient to support the prosecutor's theory of the case. The trial judge expressly noted in denying appellant's § 23–110 motion that appellant had failed to show "that the court would have ruled differently if trial counsel had argued that the indictment was constructively amended, rather than moving for a judgment of acquittal based upon the Government allegedly changing its theory of the case during its closing argument."

interview the medical staff that [appellant] came into contact with that day."

Appellant generally claims that his trial counsel was ineffective in failing to make "reasonable investigation of the case," and points in particular to counsel's failure to obtain a hospital report written by Miraen Coleman, A.C.S.W., that stated in part: "My involvement with family was minimal because police insisted on taking control of family. I was informed by police that father was being arrested for murder and that mother was being held for questioning."[30] Because the point at which appellant was taken into police "custody" was a critical issue at both the suppression hearing and the trial, *see* Part III, *supra,* appellant contends that "the hospital records and the testimony of Ms. Coleman clearly demonstrate that [appellant] was in police custody even before he left Children's Hospital, and this new information makes it clear that [appellant's] statements to the police [should have been] suppressed."

 Where, as here, a defendant's claims have been the subject of a hearing, this court must defer to the trial court's credibility determinations respecting witnesses who testify at that hearing, *Frost v. United States,* 502 A.2d 462, 463 (D.C. 1985), *cert. denied,* 479 U.S. 836, 107 S.Ct. 134, 93 L.Ed.2d 77 (1986), and the trial court's factual findings will not be disturbed unless they lack support in the record. *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985). In his memorandum opinion denying appellant's § 23–110 motion, the trial judge found that:

> At the April 10[, 1991,] evidentiary hearing, defendant's trial counsel … testi-

fied that she had [the baby's] mother sign a release in order to obtain the child's medical records. Trial counsel testified that her usual procedure was simply to obtain medical records through the issuance of a subpoena. Although [trial counsel] stated that she could not remember exactly why she had obtained [the baby's] medical records through the use of a release rather than a subpoena, she stated that she could only assume that she was instructed to use a release in this circumstance because [the baby] was a minor. [Trial counsel] testified that she had no reason to believe that she had not received all of [the baby's] medical records. She further testified that it had never been her policy to go to the hospital to actually check to make sure all the requested material had been sent because she had never had any problem receiving complete medical records in the past.

Thus, there is evidence to support the trial judge's conclusion that appellant failed to show that trial counsel's performance was deficient, and we find no error by the trial judge in denying appellant's motion.[31] *See Curry, supra,* 498 A.2d at 540.

### VI

Finally, appellant contends that the trial judge erred by denying a full and fair hearing on his ineffective assistance of counsel claim, and that the case must be remanded for additional proceedings on appellant's § 23–110 motion. Appellant points to the trial judge's denials of (1) appellate counsel's motion to obtain copies of all case files and notes of trial counsel

---

**30.** Appellant's contention that counsel was ineffective for failure to introduce evidence that doctors at the hospital did not officially pronounce the baby dead until 11:18 a.m., after resuscitation efforts had failed, is meritless. All evidence presented on the issue indicated that the baby died before she was brought to the hospital. Thus, additional evidence that doctors only pronounced the baby dead after efforts to revive her had failed is insignificant.

**31.** Nor did trial counsel's failure to obtain Ms. Coleman's report prejudice appellant. In determining that appellant was not "in custody" prior to giving his statement to police, the trial judge

held a three-day hearing during which he heard the testimony of five police officers, appellant and Ms. Medley. It is unlikely that the addition of either Ms. Coleman's report, which bears neither a date nor a time to indicate when it was prepared or when the events described occurred, and which contains several inaccuracies, or Ms. Coleman's testimony, even if admissible, about her recollections of what police officers said to her at the hospital, would have changed the outcome of appellant's suppression motion. Appellant did not attach to his motion an affidavit of what her testimony at trial would have been.

from the Public Defender Service (PDS), and (2) the motion to compel release of grand jury transcripts in connection with the constructive amendment issue raised in appellant's § 23–110 motion. We find no abuse of discretion.[32]

## A

■ The trial judge found, based on the testimony of appellant's trial counsel, that PDS withheld from appellant's appellate counsel only notes that the trial attorneys took during the trial regarding the testimony of witnesses, including "personal notes" of the attorneys, and internal administrative documents related to the handling of appellant's case by PDS. The judge concluded that such material "could not possibly be relevant to the representation of the defendant nor could the withholding of this material prejudice the defendant's case in any manner whatsoever."

Appellant's contention that the trial judge erred in denying a motion to compel discovery for the purposes of the § 23–110 motion, including "all attorney work product, and all other portions of trial and appellate case files," is based on his contention that Rule 1.8(i) of the Rules of Professional Conduct, and comments 8 and 10 thereto, required the release of all PDS files. Rule 1.8(i) prohibits attorney liens on "any part of a client's files," with an exception inapplicable here.[33] The comments to the rules make clear that once an attorney's representation of the client ends the client is entitled to the files.

In the trial court PDS responded in part by stating that it had turned over:

copies of all correspondence with [appellant], investigative memos and interview statements from all witnesses, all *Jencks* materials, medical records, photographs, pleadings, case lists and legal and scientific research. In addition, *a substantial amount* of rough notes, working outlines, internal notes and memos have been provided based on a very liberal reading of *what could reasonably be helpful* to Mr. Johnson in his appellate and post-conviction efforts. [Emphasis in original]

At the hearing, the author of the letter testified that he was not sure whether documents identified in his letter as withheld had in fact been withheld, and further that what had been withheld were the personal notes of attorneys "not intended for anyone's eyes other than their own" and "internal administrative agency type matters which ... would never have been intended to be seen by either the client or any party outside of the agency." Indeed, appellant does not dispute PDS's claim in its opposition to the discovery motion that PDS had provided many files as well as:

copies of all documents obtained during representation from the court, the police department, the United States Attorney's Office as well as all documents accumulated during its factual investigation of the case. Likewise, the [PDS] has provided successor counsel with both 'fact' and 'opinion' attorney work product generated by trial and appellate counsel.

Appellate counsel indicated, forthrightly, that PDS was very helpful, indeed "ben[ding] over backwards to be cooperative," and turned over vast amounts of material, although not all "rough notes, working outlines, internal notes and memos."

---

**32.** The trial court has broad discretion in ruling upon evidentiary matters that arise in a § 23–110 hearing. *Cf. Morrison v. United States,* 547 A.2d 996, 998 (D.C.1988) ("As a general rule, a trial court has broad discretion in deciding the admissibility of evidence"). A trial court's ruling on the relevancy of a particular piece of evidence is a "highly discretionary decision" that will be reversed on appeal only upon a showing of "grave abuse." *Carr v. United States,* 585 A.2d 158, 163 (D.C.1991) (quoting *Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990)).

**33.** Rule 1.8(i) of the Rules of Professional Responsibility provides:

A lawyer shall not impose a lien upon any part of a client's files, except upon the lawyer's own work product, and then only to the extent that the work product has not been paid for. This work product exception shall not apply when the client has become unable to pay, or when withholding the lawyer's work product would present a significant risk to the client of irreparable harm.

*District of Columbia Court Rules Annotated* (1991 ed.) at 169.

In denying appellant's discovery motion, the trial judge found that the case was continued because appellate counsel had indicated that he was optimistic that the remaining materials would be turned over to him by PDS. Further, the judge found that appellate counsel thereafter had indicated that he had been provided with a great deal of material by PDS, but not certain written notes by trial counsel during appellant's jury trial nor internal PDS memoranda. The judge concluded that appellate counsel sought "every scrap of paper," and specifically "the trial notes or scribblings and perhaps personal observations, of trial counsel during trial and internal PDS memoranda written during ... its representation of the defendant on internal office matters such as reassignment of the case." [34] The trial judge found no legal basis on which to order that these materials be turned over, observing that "[s]uch an all encompassing disclosure is not mandated by the filing of a claim of ineffective assistance of counsel, pursuant to D.C.Code § 23–110." The judge deemed *in camera* inspection inappropriate since ap-

pellate counsel acknowledged "the tremendous interest and helpfulness of the PDS in assuring that he received all relevant material so as to avoid even the possibility of prejudice to the defendant's case from the withholding of any discovery material." Therefore, the judge concluded that PDS had already provided "all relevant information to counsel."

 This issue could have been avoided had prior counsel turned over all of their files developed in connection with representation of appellant to successor counsel. There appears to be no good reason that such full disclosure did not happen here. A client is, generally speaking, entitled to have successor counsel make the determination of what material in the client's file is relevant to the representation of the client, and not to be forced to rely on former counsel's evaluation of what is relevant or marginal. This court routinely directs that prior counsel turn over all documents to successor counsel, although no such language was included in the orders in this case.[35] Moreover, where disputes arise be-

**34.** In its opposition to the discovery motion, PDS referred to a telephone conversation with appellate counsel in which appellate counsel had indicated that "his request encompasses 'every scrap' of paper collected or produced during the course of PDS's representation, including administrative records, internal memoranda, notes, scribblings and thoughts of trial and appellate counsel." PDS also argued in opposition that the motion was premature in the absence of a showing that informal attempts to obtain disclosure were unproductive, citing Super.Ct.Crim.R. 16–II and *United States v. Gibson,* 566 A.2d 473, 478 (D.C.1989).

**35.** We need not decide whether concepts of property interests in client files, as established in ethical rules such as Rule 1.8(i), define the obligation of prior counsel to successor counsel. Nor need we decide if the discovery rules control in matters between prior and successor counsel.

PDS pointed out in its opposition to the discovery motion that there are limits to discovery in the rules of court as well as other relevant ethical rules. *See* Super.Ct.Civ.R. 26(b)(3) (attorney work product); *Parks v. United States,* 451 A.2d 591, 608–09 n. 30 (D.C.1982) (civil discovery rule applicable to criminal cases). The court recognized in *Parks, supra,* that the work product privilege applies as between co-defendants because the rationale is to encourage pre-trial preparation. 451 A.2d at 609. Al-

though former and successor counsel for the same client are not in a comparable adversarial mode, the rationale for the work product rule may still apply since counsel might refrain from recording his or her thoughts for fear of later disclosure. *See also Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (rejecting the every scrap of paper approach with respect to opposing counsel's efforts in discovery).

PDS also cited Rule 1.16(d), declining or terminating representation ("... a lawyer shall take timely steps to the extent reasonably practicable to ... surrendering papers and property to which the client is entitled...."), and *District of Columbia Bar Legal Ethics Committee Opinion* 168 (April 15, 1986), 114 *Daily Wash.L.Rptr.* 1001 (May 16, 1986), noting American Bar Association Committee on Ethics and Professional Responsibility Opinion 1376.

Opinion 168 states that an attorney "shall deliver, upon request, the entire contents of the client's file ... to his former client or substitute counsel, unless the attorney can reasonably conclude that the failure to deliver requested materials will not prejudice his former client's interests.". Opinon 168 further states that the requirement that an attorney deliver, upon request, the entire contents of the client's file "does not mean that every document in the possession of the lawyer must be delivered to a former client on request." The Opinion indi-

tween successor and prior counsel that cannot be resolved informally, the trial court would be well advised to review the documents *in camera, cf. Parks, supra* note 35, 451 A.2d at 608, 610, in order to avoid a later remand by this court.

 Here, however, the record indicates that the only materials not disclosed by PDS to appellant's successor appellate counsel were trial counsel's notes or scribblings made during the jury trial, and internal administrative memoranda of PDS regarding reassignment of counsel. Notes that an attorney took while a witness was testifying would be irrelevant to proof of a claim of ineffective assistance of trial counsel. Attorney practices in this regard could vary widely, and would not have anything to do with whether or not a defendant received effective assistance of counsel. While a transcript of the witness' testimony would not contain counsel's personal notations of impressions of the witness that might appear in counsel's notes, appellant has not suggested how such notes would relate to proof of ineffective assistance of counsel. In the trial court appellate counsel relied on a letter written by the chief of the Appellate Division of PDS that appellate counsel viewed as indicating that the actions of trial counsel were akin to ineffective assistance of counsel. However, the only relevant comment in that letter refers to an issue that we hold is without merit, namely the claim that there was a constructive amendment of the indictment. Likewise, appellant has failed to suggest how the fact that a case is assigned to one attorney or reassigned to another attorney would have any bearing on proof of ineffective assistance.

Accordingly, under the limited circumstances here, where the materials sought did not fall within the scope of the challenge to trial counsel under § 23–110, and in view of the undisputed fact found by the trial judge that PDS "had been extremely helpful and forthcoming" with successor counsel, we conclude that the trial judge did not abuse his discretion in denying the discovery motion.[36]

Accordingly, we affirm the judgments.

cates, however, that prior counsel should retain copies in the event of a malpractice suit. Commenting that the fundamental goal is to assure that a former client is not prejudiced, Opinion 168 states that, to this extent, certainly, counsel must "completely and promptly" turn over materials generated in the course of representation, "with material withheld only where it can reasonably be concluded that such withholding will not result in foreseeable prejudice to the former client." *Id.* Opinion 168 concludes that prior counsel bears the risk of non-production. *Id.*

36. Appellant's other contentions, that the trial judge erred by denying his motion to compel release of the grand jury transcripts, and by quashing the subpoena appellant had served on James Klein, are meritless.

Appellant's counsel received from PDS the transcripts of testimony given to the grand jury by Ms. Medley, Detective Patrick McGinnis, Thomas Hunsicker and Saturnino Lopez. *See* Motion to Compel Release of Grand Jury Transcripts, Jan 29, 1991 at 1. PDS had been provided with copies of these transcripts in response to its request for *Jencks* material at trial. Appellant argues that it was necessary for the government to turn over transcripts of the testimony of all other witnesses who testified before the grand jury but did not testify at trial, in order to determine whether appellant's trial counsel was ineffective. In view of the compelling interest in the secrecy of grand jury proceedings which can only be overcome upon a "strong showing of particularized need," *see Law v. United States,* 488 A.2d 914, 916 (D.C.1985) (quoting *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 434, 103 S.Ct. 3133, 3143, 77 L.Ed.2d 743 (1983)); *Salim v. United States,* 480 A.2d 710, 717 (D.C.1984); *see also* Super.Ct.Crim.R. 6(e), we find no error by the trial judge. Because appellant's trial counsel did not have access to these grand jury transcripts, it is extremely difficult to imagine what bearing they could have on whether trial counsel was ineffective. Trial counsel did request the transcripts, and appellant has not suggested the nature of the evidence he seeks, much less the names of the witnesses. Thus, the trial judge did not abuse his "substantial discretion" in denying appellant's motion to compel production of the additional grand jury transcripts. *Law, supra,* 488 A.2d at 916 (quoting *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 223, 99 S.Ct. 1667, 1675, 60 L.Ed.2d 156 (1979)).

Nor did the trial judge err in quashing the subpoena that appellant had served on James

Klein, Chief of the PDS Appellate Division, appellant's original appellate counsel. Appellant claims that Mr. Klein's testimony would have been relevant to establish that trial counsel was ineffective because Mr. Klein had indicated in a letter that PDS was "troubled by the lack of precision in trial counsel's response" to the alleged constructive amendment. *See, supra* Part

IV. The trial judge properly denied appellant's request to call Mr. Klein as a witness in the § 23–110 hearing because, as the judge noted, Mr. Klein did not participate in the trial. Appellant made no showing of a need for Mr. Klein's testimony in addition to his letter, which was before the trial judge.